See *The Egypt, infra.*

---

## THE EGYPT.

(*District Court, E. D. Virginia.* July 2, 1883.)

1. SALVAGE—INCORPORATED SALVAGE COMPANY.

An incorporated company, organized for the purpose of engaging in the meritorious work of saving ships in distress, and devoting themselves diligently to that pursuit, may be granted salvage award as liberally as natural persons so engaged.

**2. SAME—TOWAGE—VALUE OF PROPERTY.**

Towage is not salvage, and when considered by itself is never compensated except on the principle of paying according to its worth for work and labor performed; and the value of the property towed is but slightly, if at all, considered in determining the compensation to be awarded. Consequently, precedents as to amounts awarded for towage furnish no guide or rule in cases of pure and true salvage where towage is but an incident, and figures only as a winding-up formality after an arduous and difficult salvage service.

**3. SAME—AMOUNT OF AWARD.**

The courts ascertain the value of the property saved, and grant such a sum in reward as they deem proper; and, although the ancient rule as to the value of the property forming the basis of the award has been somewhat relaxed in modern times, they still adhere in general to the rule of measuring the amount of their rewards by some proportion of the aggregate value of the property saved.

**4. SAME—COMPENSATION AND REWARD.**

Salvage consists (1) of an adequate compensation for the actual outlay of labor and expense used in the enterprise; and (2) of the reward as bounty allowed from motives of public policy as a means of encouraging extraordinary exertions in the saving of life and property in peril at sea. The first of these items of award admits of computation; the second does not, and is usually determined with more or less reference to the value of the property saved.

**5. SAME—RISK OF LOSS—CHARACTER OF COAST.**

Where the coast is thinly settled, and lined with dangerous sand-bars, and frequently visited by violent storms and hurricanes, this fact may be considered in ascertaining the amount of a salvage award.

**6. SAME—CASE STATED.**

Where a steam-ship of great value, carrying a valuable cargo, went ashore off Paramore's island, Virginia coast, on the Atlantic ocean, where it was thinly settled, and ship and cargo were in imminent peril of total loss, and the salvage service rendered was rendered with extraordinary skill and success, consumption of much time and labor, and great risk to the property used in the enterprise, which was of great value, one-fifth of the value of the ship and cargo and the salvor's expenses were allowed for the salvage service, considering the fact that efficient aid was afforded by the ship's crew in saving the ship and cargo.

*The Sandringham,* 10 FED. REP. 553, distinguished.

In Admiralty.

### STATEMENT OF FACTS PREPARED BY THE JUDGE.

The British steam-ship Egypt, of Liverpool, England, Robert Reavely, master, went ashore off Paramore's island, Virginia, at about noon on Thursday, the eleventh of January, 1883. She was a vessel of 1,550 tons burden, with iron compartments and water-ballast tanks; of great length, and proportionally narrow beam, and difficult of management when aground. Paramore's island is off Accomac county, on the Atlantic coast, about 33 miles north of the channel which makes out of Hampton Roads into the ocean between the capes of Chesapeake bay. The island lies between Wachapreague and Machipungo inlets. The Egypt was loaded with 3,835 bales of compressed cotton. The value of ship and cargo is fixed by agreed estimation at $250,000. The ship had cleared at Charleston, and was bound for Bremen, via Hampton Roads, the intention being to enter the capes of Virginia for the purpose of taking on coal at Newport News.

At 8 o'clock on the morning of the eleventh of January she was 32 miles to the northward of where her master supposed her to be. He was unaware of having passed the capes, and had not seen land since leaving Charleston. The weather had been exceptionally severe during the voyage, and foggy and hazy. No observation for the latitude was practicable, and the force of the current was unknown to her navigators. The ship first struck on the reef or sand-bar which lies abreast of Paramore's island, and 400 to 500 yards off from it. She lay there for more than 24 hours. Passing that reef, she then struck the main shore of the island at a distance, first, of about 400 yards from low-water mark; and afterwards she was driven to within 250 yards of the shore, where she became imbedded in the sand, and where she threw out her anchors. The ship struck the outer reef at 12:15 P. M. of the 11th, the wind being then a moderate breeze from W. N. W. A thick snow was falling, the snow-fall having begun about 11 A. M. The ship was provided with but a small anchor, and the master and crew were unable to get her off. She lay at an angle of about 45 deg. with the shore, heading to shore north-westerly, and was badly listed to starboard. She lay in that position all the rest of the day, and all the night, of the 11th. No sail was seen until 10 A. M. on the 12th, when flags of distress were hoisted to the United States revenue cutter Hamilton, which was going into Hampton Roads. The Hamilton came to anchor as near to the Egypt as the shallow water would admit, and sent her a boat to see what she needed. The officer from the Hamilton was informed that the steamer could not get off without the assistance of wreckers, in the position in which she was lying. The officer said to the master that the Baker people were the nearest and best wreckers to be had, (meaning the Baker Salvage Company, of Norfolk, the libelants in this cause,) and, finding that he could do nothing himself, he returned to the cutter and proceeded to Old Point Comfort. On arriving there, Capt. Deane, of the cutter, at once telegraphed to Capt. E. M. Stoddard, superintendent of the Baker Salvage Company, at Norfolk, the condition and position of the Egypt; Capt. Stoddard receiving the telegram at 6 P. M. on the twelfth of January.

The Baker Salvage Company, of Norfolk, is a corporation organized for the purpose of performing salvage services, and devotes itself at all seasons to that business. Its capital stock is $100,000, and it claims to own, and keep on hand at all times for use, wrecking property, vessels, and apparatus costing more than a hundred thousand dollars. Embraced in this outfit are two large wrecking steam-tugs, —the Victoria J. Peed, of 134 tons, and the Resolute, of 124 tons; the schooners B. & J. Baker, Breed, Cruze, and Maria Jane; three or more wrecking surf-boats; three or more wrecking steam-pumps; a number of very heavy anchors, three of these weighing, respectively, 1,800, 3,000, and 3,500 pounds, with chain-cables, and manilla and steel-wire hawsers of strength to be used with such anchors; and

hoisting and heavy tackle, and other wrecking apparatus and appliances in full complement. All of this wrecking outfit was brought into requisition by the libelants in saving the Egypt and her cargo. They also employed the small steam-tug William Gates, and the powerful towing-tug of 172 tons, the Argus, in this service.

The value of the property employed on the occasion is estimated, by witnesses on the part of the libelants, at about $125,000. It can be safely placed at $100,000. The libelants employed about 135 men in this undertaking, made up of the crews of the several wrecking vessels, and that of the Egypt, numbering 23, who were hired by the libelants for the occasion, and of experienced wrecking laborers and cotton stevedores. It is to be remarked, as to the property employed by the libelants in this salvage enterprise and all others, that it was not insured; the hazard to which it is subjected making insurance companies unwilling to take risks upon it. The libelants aver that the cost of keeping up their wrecking establishment is, for eight months of the year, about $5,000 per month; and for the rest of the year about $2,500 per month. It is in proof that all or nearly all of the wrecking companies of the Atlantic seaboard, except the libelants, have gone out of existence, in consequence of losses in business, caused in great part by the inadequate amounts of salvage awarded them by the admiralty courts, and that the business of the libelants has not been prosperous. The operations of the Baker Salvage Company, of Norfolk, extend over the whole Atlantic coast, the West Indies, and the Gulf of Mexico, and the bays and rivers connected with them.

When Capt. Stoddard received the telegram of Capt. Deane, on the night of the twelfth of January, the wrecking steam-tug Victoria J. Peed was engaged in a salvage enterprise off Kitty Hawk, 40 miles south of Cape Henry. He at once ordered her by telegraph to leave there and proceed forthwith to the relief of the Egypt. The wrecking steam-tug Resolute happened at that time to be undergoing repairs for injuries received on the preceding day, and could not at once proceed to the Egypt. Capt. Stoddard, therefore, hired the small steam-tug William Gates, the only available vessel in Norfolk harbor at the time, and left Norfolk at 12 in the night to go to the Egypt; arriving at 9 A. M. on the thirteenth of January at the place where she lay. The Gates was too small to take along any wrecking apparatus, and Capt. Stoddard's object in going off in the night was to acquaint himself without delay with the condition of the Egypt; to know positively what was needed for her relief; and to ascertain whether his company would be engaged for this salvage service. On his arrival he was requested by Capt. Reavely to undertake the service; Capt. Reavely expressing the belief that the ship could not be saved, especially if the wind should get again to the eastward. Capt. Stoddard agreed to undertake the service, upon the condition that he should have exclusive direction of operations, deeming this

condition essential to success in the tedious and critical enterprise he was undertaking. He was employed on those terms, the amount of salvage not being stipulated. Capt. Stoddard at once employed the crew of the Egypt to assist in the service, on wages then agreed upon. He sent the Gates off to Norfolk at once, with full instructions to the company here as to what should be sent him and what should be done. With the assistance of the Egypt's crew he at once addressed himself to preparations for the work before him. He found the Egypt, as before described, lying south-east of the island, inside of the reef that has been mentioned, and between two sand-bars which stretched out for more than a mile from either end of the island. These bars had been formed by the tides running in and out of the two inlets lying north and south of the island. These bars placed at hazard all vessels coming to the assistance of the Egypt, making it necessary for them to keep away during the prevalence of easterly or north-easterly winds, whether they were sail-vessels of light draft coming to receive cargo taken from the ship, or steam-vessels of greater draft giving aid in laying ground-tackle, and in attempts to pull the ship off the sand-beach.

Thus the Egypt was lying in a shallow bay, bounded on three sides by sand-reefs, and on the other by Paramore's island; the eastern side of which was a marsh swept over by the higher tides; the island itself being desolate and uninhabitable. The depth of water where the Egypt lay, was, at low tide, seven feet at her stern, and five and a half feet at her bow. She drew, with the load she had upon her, thirteen feet and a half. She was, therefore, imbedded in the sand at least seven feet, at low tide. She lay upon a sand bottom, which is hard when still, but which, when a heavy body rests upon it, causing currents, is cut away by the flow of the water, leaving the body to sink deeper and deeper in the sand the longer it remains. This sort of quicksand exists all along the Atlantic seaboard south of the capes of the Delaware, and it is found that wrecked vessels left to their fate on this coast gradually sink lower and lower in this sand until they finally disappear below the surface of the water. The Egypt lay nearly broadside on the beach of Paramore's island, so badly listed to starboard that it was difficult to walk on her deck; and liable to be broken up and wrecked at any recurrence of an easterly or northeasterly storm. Under the action of the currents upon the sand on which she lay she was forming a bed, or pool, which became deeper with the length of time she remained. That she did form such a pool is proved by the testimony both of the ship's crew and of the libelants. The officers of the ship, sounding with leads, dropped close along her sides, found 12 to 14 feet of water; while the soundings made by the libelants, at a distance of 30 or 40 feet off from the ship, showed only 5 to 7 feet of water, at low tide.

The variation of the tides on the Atlantic, near the mouth of

Chesapeake bay, is only about two and a half to three feet; and this circumstance renders it impossible to rescue a ship of the size, tonnage, and depth of draught of the Egypt from such a position as she was in, by pulling at her with tugs at high tide. Before the ground tackle was planted she had sunk below the ground level of the sand bottom from five and a half to seven feet, and a tide of only two and a half to three feet could not by possibility elevate her sufficiently to enable her to be drawn off by main force. High tide did not lift her above the general level of the bottom, where she lay by three to four feet; and it was not, therefore, in the power of tugs to draw her off. This condition of things differs greatly from that which exists in waters of the higher latitudes of both continents. On the coast of Great Britain, especially, the variation of the tide is 10 feet in some localities, and much greater in others, running up as high as 40 feet at many points of the coast. There, the usual method of rescuing vessels that have been stranded is by attaching powerful tugs to them, waiting for the tide, and then pulling at them with might and main. Familiar with this plan of operations, the masters of English vessels, stranded on our seaboard, almost invariably complain of the refusal of our wreckers to resort to this expedient for getting their ships off. The master and crew of the Egypt labored under this same delusive predilection. Deceived by the soundings made from the sides of their ship into the pool which she had made for herself in the sand, they could not realize why their ship could not be drawn off by tugs, with the water apparently at 12 to 14 feet at high tide. Another disadvantage which beset the Egypt was that the beach where she lay was desolate,—far removed from any habitation,—beyond the reach of, and without communication with, any life-saving station; and possessing no means of communication, by telegraph or otherwise, with sources of assistance or places of refuge from storms. This placed her master at first, and the salvors afterwards, at great disadvantage, and subjected them to all risks of the sea, except such as could be avoided or combated by constant wariness and skilled seamanship. The service of salvage performed here was necessarily a service involving continual risk to life and property, in which success was only to be achieved by skill, experience, and unfaltering alertness on the part of the salvors.

The plan of operations necessary to be pursued, and which was determined on from the first by Capt. Stoddard, who is conceded to be one of the most experienced and successful wreckers on the Atlantic coast, was, (1) by means of ground-tackle, of heavy anchors, and strong cables, to bring the ship around perpendicular to the shore, and hold her in that position to prevent her from being broken up by the sea; and (2) to lighten her of her cargo, by means of surf-boats and light-draught sail-vessels, to a sufficient extent to allow of her being drawn off into deeper water, first by the cables, and then by these cables re-enforced by the powerful tugs Argus, Peed, and Resolute. Such was

the plan of operations patiently, perseveringly, and laboriously pursued by Capt. Stoddard and his assistants. In the course of the work they made constant use of the Egypt's engines, winches, cables, and tackle, in conjunction with the wrecking implements of their own which have been mentioned.

The planting of the ground-tackle was the first thing to be done. The Victoria J. Peed arrived from Kitty Hawk at 6 P. M. of Saturday, the 13th, and anchored near the Egypt. She was commanded by Capt. C. D. Jenkins, an experienced seaman and skillful wrecker, and had on board a surf-boat, a stationary steam-pump, and other wrecking apparatus. The Resolute, bringing in tow the wrecking schooner B. & J. Baker, with the large anchors and cables of the libelants, one or two surf-boats, and various wrecking apparatus on board, arrived at 7 A. M. on the morning of the 14th; but the weather was thick, and, though her whistle was then heard, she could not get near enough to the Egypt to be seen until about 11 o'clock on that morning. A strong wind blew almost a gale from the north on that day, making it extremely difficult to run a line from the Resolute to the Egypt, without which the anchors and cables could not be laid. As many as three unsuccessful attempts were made to run a line, and the salvors failed, in consequence, to lay their ground-tackle on Sunday; but they did succeed in taking off nine bales of cotton on surf-boats on that day. On the morning of Monday, the 15th, the weather and sea had moderated sufficiently to allow the ground-tackle to be laid without much difficulty. Accordingly the 3,000 pounds anchor of libelants was laid to seaward south-easterly from the ship, with 90 fathoms of manilla hawser, and the same length of steel-wire hawser belonging to the ship. The 1,800 and the 3,500 pounds anchors were also laid out, with 140 fathoms of steel-wire hawser, 212 fathoms of 12-inch manilla hawser, and 30 fathoms of chain; all belonging to the salvors. These hawsers were connected by falls to the ship's machinery, which was used in heaving on the cables during the entire salvage operations. By means of this ground-tackle the ship, which had finally worked up to a position nearly broadside to the beach, had sunk to eight feet in the pool, and had taken water in her hold until it covered her water-tanks, was hauled around square with the beach, with her head close to low-water mark. On this same day the salvors were able to begin the work of surf-boating the cotton from the ship to the B. & J. Baker; the sea being, on that and on all other days but one, too rough to permit of the schooners being brought along-side. The work of breaking the cotton out of the ship, listed as badly as she was, was exceedingly laborious, and the operation of letting it down over the sides of the ship into the surf-boats, on a rough sea, was attended with much danger to all employed in the task,—especially to those in the surf-boats; the heavy bales being liable to fall upon them and to crush them. It may here be remarked that during the week commencing on this Monday, the 15th, 700 bales of cotton were taken out of the

ship, lightening her about 150 tons, and that this work was done with so much care and skill that not a single bale was lost or a man injured.

On Tuesday, the 16th, the wind shifted to the north-east and north, and the weather and sea were so rough, snow constantly falling, that the surf-boating of cotton was rendered exceptionally difficult, and but few bales could be removed. The salvors, however, succeeded in moving the ship four feet to the seaward, and materially relieving her in her position. It was on this day that discovery was made that the ship's rudder was broken, and by its swinging motion was endangering the stern of the ship, which was already much injured from this cause. Measures were at once taken to make fast the rudder to prevent further injury; and it was afterwards drawn up on deck. On the evening of this day the schooner Baker was dispatched to Norfolk in tow of the Peed with a load of cotton.

On Wednesday, the 17th, the weather was foul and rainy, with wind varying and the sea heavy, growing more and more so as the day advanced, so that the salvors succeeded in shifting but one surf-boat of cotton. The ship had now listed to port, in consequence of so much cotton having been taken from her starboard side, and was in danger of going over on her beam-ends, and it became necessary to work much of the night in shifting cotton bales to the starboard side of the ship.

On Thursday, the 18th, the weather had again moderated, and the salvors succeeded in moving the ship astern about 12 feet. They also surf-boated a good deal of cotton from the forward hatch to the schooner Breed. Moreover, the schooner Cruze, which drew less water than any of the sail-vessels, was hauled along-side the after-part of the ship and loaded with cotton from the after-hatch. Between four and five hundred bales were taken off on this day. The ground-tackle was also shifted further out to the eastward. The Resolute went off that night, having tow of the Cruze to Norfolk. That night the weather again became bad, the wind again shifting to the eastward; and on Friday, the 19th, the weather and sea were so rough that the Peed had to put in to Wachaprague inlet, and the schooner Breed to go into the capes. But the salvors succeeded in moving the ship 200 feet astern, until she struck on the reef.

On Saturday, the 20th, the sea was too rough to allow the boating of cotton, or to leave it safe for the wrecking vessels to cross the breaker line. But on that afternoon the salvors moved the ship astern about 200 feet, continuing to heave upon the cables during the night, thus increasing this distance to 500 feet; and at 7 A. M. on the morning of Sunday, the 21st, they finally succeeded in getting the ship afloat. The rest of the 21st was spent in getting up the ground-tackle, and in towing the ship into Hampton Roads by means of two steamers,— one forward of the ship, and another in the rear to steer her, in the absence of her rudder. She was brought to the quarantine station

below Norfolk at about 2 o'clock on the morning of Monday, the twenty-second of January,—eight days having been employed in effecting the salvage service; the vessel and all her cargo being brought safely into port, with no other injury to either than the broken rudder, and the damage inflicted by it to the stern of the vessel.

It is to be added that there was no other organized and abundantly furnished wrecking force that could have been brought to the rescue of the Egypt than that of the Baker Salvage Company, and that the cash outlay of this company in the enterprise was $4,256, besides regular expenses.

*Sharp & Hughes* and *Ellis & Thom,* for libelants.

*John H. Thomas,* for respondent.

HUGHES, J. This case corresponds so nearly in its general character and in its details with that of *The Sandringham,* 10 FED. REP. 556; S. C. 5 Hughes, 316, decided by this court a year ago, that I do not feel called upon to deal particularly with every question of law arising in it. There was no appeal from my decision in the case of *The Sandringham,* and the questions of law therein decided must be regarded, until reversed by some appellate court, as the law of this court and of this port.

The present is a case of salvage of the most meritorious character. The service was rendered under all the circumstances which constitute merit in a salvage enterprise. There was (1) great danger, from which the property of respondents was rescued; (2) great value in the property saved; (3) serious and continual risk incurred by the salvors and their property; (4) great value in the property that was put at risk and employed in saving the ship; (5) extraordinary skill and success in rendering the service; and (6) much time and labor spent in the enterprise. These, the six ingredients usually held to constitute a salvage service of the highest merit, all entered conspicuously into the enterprise under consideration. In these respects the case is, I repeat, so like that of *The Sandringham,* that I need only refer to the reasons I then gave for granting a liberal award in the present case. Adopting that decision as furnishing the rule of decision here, I will do no more on the present occasion than treat one or two questions which have been elaborately discussed at bar, and review the authorities cited by counsel for respondents in opposition to a large award.

I shall treat as settled law the point that an incorporated company, organized for the purpose of engaging in the meritorious work of saving ships in distress, and devoting themselves diligently to that pursuit, may be granted salvage reward as liberally as natural persons so engaged may be. *The Camanche,* 8 Wall. 448. This being assumed, I will first consider one of the principal questions of law discussed at bar. Let it be premised that it has been the habit of admiralty courts for centuries to estimate their awards of salvage by proportions of the value of the property saved. This practice arose

in those times when there often was no other practicable method of
bestowing salvage rewards than by a division in kind of the property
saved. That reason having now ceased, the courts in modern times
are more and more abandoning that method of distribution. They
ascertain the value of the property saved. They grant such a sum
in reward as they deem proper; and if this sum is not paid, they
decree a sale of the ship, or of so much other of the saved property,
if there be any, as shall be necessary to satisfy the award. But they
still adhere in general to the practice of measuring the amount of
their rewards by some proportion of the aggregate value of property
saved. It thus happens that where this value proves to be very
large, as in the present case, respondents in admiralty suits object to
the practice; urging that the awards being in great excess of what
the labor of effecting the salvage is worth, the owners of the property
in such cases are made to pay indirectly for services rendered in
cases where the amount saved is small and the compensation received
by the salvors inadequate. I am inclined to believe that the courts
will in time come to fix the amount of their awards with very little
reference to proportions. But if they do, I am sure the reason of so
doing will be founded on some other objection than the one which
has been indicated. The defense in the present case is only nomi-
nally made by the owners of the Egypt. It is really made by the
agent in this country of the Board of Foreign Underwriters. Now,
the practice of determining salvage rewards by proportions is really
based on the principle of contribution from the fortunate for the
benefit of the unfortunate; which is the principle on which all insur-
ance is based. It is but another application of that principle; and
I am inclined to think that insurers, if no other class, are morally
estopped from objecting to its application in salvage cases. It is for
the advantage of commerce, and certainly in the interest of human life
risked at sea, that respectable and thoroughly organized and equipped
wrecking companies should be encouraged and sustained on the wild
and stormy coast which stretches from the Delaware capes to the Gulf
of Mexico. The danger of this coast is so great that many vessels are
lost in spite of the most arduous and expensive exertions of the wreck-
ers, who lose their labor and property, and risk their lives, in fruit-
less attempts to save them. In other cases the total value of prop-
erty saved, after great labor and risk, is often far below the cost of
rendering the service. When, therefore, a valuable ship and cargo is
rescued from the jaws of destruction by this same class of men, would
it be just or wise to deprive them of the benefit of an ancient rule of
maritime reward, and cut them down to a sum not greatly exceeding
a *quantum meruit pro opere et labore?* Surely, if this be done, the
change of rule ought to have some better justification than the objec-
tion that the old rule required contribution from the fortunate for the
benefit of the unfortunate. For one, I am unwilling to be instru-
mental in inaugurating the new rule on this dangerous coast, where

it may be said, I think, with truth, that a majority of salvage services bring either no compensation at all to the salvors, or compensation far inadequate to reimburse them for the work and labor and risk attending their enterprises. Passing to another question, I think the present case furnishes a fit occasion for repeating what I said in the case of *The Mary E. Dana*, decided last year, 5 Hughes, 369; [S. C. *ante*, 353.] I there said:

"Salvage services rendered on the long and dangerous coast which stretches from the Delaware capes to Florida, ought to be more liberally rewarded than on other coasts. It is not a seaboard studded with harbors and prosperous commercial cities and towns, from which salvors may run out short distances along shore, and render successful services in a few hours. It is a long coast, dangerous and barren, constantly swept by strong winds and currents; where the ordinary tide varies only three feet, and on which wrecking enterprises cannot be successfully accomplished by individual exertions and capital. Wrecking service here can only be successfully performed by organized capital, enterprise, and skill,—by capital, skill, and enterprise so organized as to be capable of maintaining a constant provision of experienced mariners, powerful wrecking vessels, and ample wrecking implements and material ready at all hours for immediate service. The business cannot sustain itself in the hands of reputable men and companies, unless the admiralty courts shall give exceptionally liberal awards in all cases of meritorious and successful service on this sea-board. And surely it is in the interest of commerce to sustain the wrecking business in these waters and latitudes. For these reasons, I repeat, salvors on this coast must be more liberally dealt with by the admiralty courts than on other coasts."

What I then said I have found sanctioned and sustained, by anticipation, in a passage quoted in Cohen's Admiralty Law, 131, from a publication of Judge MARVIN, printed in 1861, in which that able admiralty judge is shown to have said, while judge of the southern district of Florida, in the case of the ship *Belle Ocean and Cargo*:

"What would be no more than reasonable on this coast, where so many shipwrecks occur, and where the assistance of so few transient or trading vessels can be had to save the property, and where, consequently, the employment of a number of regular wrecking vessels has been found necessary for that purpose, might be unreasonably large in the neighborhood of commercial ports, on the coast of England or the United States, or in any place where regular wrecking vessels were unnecessary, because wrecks were fewer, and the assistance of transient persons or vessels could be more easily obtained."

It is to be observed that the bottom on the west Florida coast is, in general, hard and rocky, with no quicksand such as that on our coast. I am firmly of opinion that it is incumbent upon admiralty courts, in dealing with salvage cases arising on the long and dangerous coast extending from Delaware bay to Florida, as well in the interest of commerce as of humanity, to be exceptionally liberal in their awards to regularly organized salvage companies, in order to provide a certain and continuing reliance for vessels in distress upon trained and experienced wreckers, reputable in character, honest in their

dealings, and of position in society rendering them responsible to public opinion for their conduct.

I will now examine briefly the cases cited by respondent's counsel in opposition to a liberal award to the libelants in the case at bar; for I do not deem it necessary to more than advert to what seems to be the principal ground of criticism and complaint on which the respondents base their defense, which is that Capt. Stoddard, on arriving at the Egypt at 9 o'clock on the morning of Saturday, the thirteenth of January, did not then have along with him the Peed, the Resolute, and his four wrecking schooners, with a full complement of men and wrecking implements and apparatus. If there had been any failure in the salvage enterprise, if the ship had gone to wreck, if any part of the cargo had been lost, or any disaster or destruction whatever sustained in the course of the salvage operations, this objection would have been pertinent, provided the misfortune could have been colorably traced to the delay in the arrival of these vessels and equipments. More reasonably still: if Capt. Stoddard, before he went to the Egypt, had been seen by Capt. Reavely at Norfolk or at Old Point, and engaged there for the salvage service, and informed then and there what material, vessels, and men he would need, the objection might be urged with some force. But I have not thought it worthy of any serious consideration, in face of the fact that Capt. Stoddard was not employed in the salvage service until he went to the ship in distress; and that every bale of cotton was saved, not a single particle of the cargo was jettisoned, and that the ship herself was brought from her position of apparently hopeless danger on the beach, safely into port, so little injured that, after repairs to her rudder and stern, she was able in a few weeks to resume and complete her voyage with all her cargo on board.

Disregarding this objection of respondents, therefore, I pass to a review of the authorities cited by their counsel in his brief.

I will remark in advance that *towage* is not *salvage*, and, when considered by itself, is never compensated, except on the principle of paying according to its worth for work and labor performed; that is to say, in legal phrase, it is paid for on the basis of *quantum meruit pro opere et labore*. Of course, when this rule of compensation obtains, the value of the property towed is but slightly, if at all, considered in determining the compensation to be awarded. There are, indeed, frequent cases where, although towage is the dominant feature of the service rendered, yet the ship towed was in a situation of greater or less danger when taken in tow. In these cases an inconsiderable bounty, or salvage reward, is brought into the award, the case in its main feature being a towage case. But nothing could be more illogical than to argue, from the awards of courts in towage cases, what amounts they should decree in cases of salvage.

In the case of *The Plymouth Rock*, 9 Fed. Rep. 413, where the value of ship and cargo was $60,000, which was a case of simple towage,

the vessel being disabled off Sandy Hook, a tug was allowed $2,000 for bringing her into the port of New York, a distance of some 20 miles. There was no element of salvage in the service, except that the vessel was disabled, had a number of impatient passengers on board, and her own machinery was too much out of fix to bring her in.

In the case of *The Camanche*, 8 Wall 448, where a vessel laden with valuable machinery had sunk in the harbor of San Francisco, and the salvage service consisted in diving at leisure for it and drawing it up by strong steam appliances, consuming four months of time, and where there was but a partial salvage of the property sunk, the supreme court of the United States allowed $24,062 on a value of $75,000 saved. That is to say, one-third; the salvors receiving other and larger remuneration by contract in the same service from insurance companies.

In the case of *The Blackwall*, 10 Wall. 1, a ship took fire while lying in the harbor of San Francisco. The city firemen, availing themselves of the aid of a tug, went to her relief, and in 30 minutes extinguished the fire. The supreme court of the United States allowed $10,000 for the service; what remained of the ship saved from the flames being valued at $60,000. There was scarcely more than one ingredient of a true salvage service in the case, viz., the ship was in imminent danger of destruction.

In the case of *The Adirondack*, 2 Fed. Rep. 387, the service performed was simple towage. The ship was disabled at sea in her machinery. Another steamer took her in tow and brought her about 600 miles into New York. The court awarded $7,500, or $1,500 a day, for five days' towing. The value of the Adirondack, which is an immaterial circumstance in a case of mere towing, was $300,000.

In the case of *The Colon*, 4 Fed. Rep. 469,—which was another case of mere towing,—a steamer was disabled in her machinery at sea, and was taken in tow by another steamer, and towed 720 miles into New York. The court awarded $10,000 for six days' work; the towing vessel in this, as in the preceding cases of towage, being herself bound for New York.

The case of *The Edam*, 13 Fed. Rep. 135, was another case of mere towage. The Edam had broken all the blades of her propeller, and was disabled at sea, a few hundred miles from New York. She was taken in tow by a strong steamer, the Napier, and brought into New York in three days. The award was $25,000; the more, in this case, because the towing steamer reversed her own course (having been bound for Liverpool) in order to return to New York.

In the case of *The America*, Marvin, Wreck & Salv. 217, lost on the Tortugas, the cargo only was saved, and the success of the salvage service was but partial. Here $47,971 was allowed for saving portions of the cargo,—being at the rate of one-fourth on that which was saved in uninjured condition; one-half on that saved in a wet and

damaged state, and three-fifths on that which was saved by diving. The wrecking vessels used on the Florida reefs are not "large." They are very small. They are mere smacks. Some of them are a little larger than others; and it is only in that sense that they are termed "large" in the reports of salvage cases arising on those waters.

In this case of *The America,* Judge MARVIN applied his rule, which will be found to have entered into all his decisions in the Florida court, viz.: that where the salvage service was not successful, and more or less property was lost, the award was smaller in proportion as the property lost was greater. See what he said on this head in the case of *The Isaac Allerton* quoted by me in *The Sandringham Case,* and appearing in 10 FED. REP. 579. The salvage service in the case of *The Allerton* was wholly successful, and the learned judge awarded half of the value of the property saved ($96,000) to the salvors. I repeat here what I myself said, in commenting on this rule of Judge MARVIN, (Id. 579:)

"I think, with the court in *The Allerton Case,* that the proportion of the property lost must enter into consideration. In a case in which, out of property worth $200,000, only the value of $50,000 was rescued, I would give a smaller percentage for salvage than I would in a case where, other circumstances being equal, property worth $50,000 was in danger, and all was saved. In the first case, other circumstances being the same, and the service such as equally to deserve a liberal allowance, I might feel it unjust to give more than one-tenth; while, in the second. I might think it equally unjust to allow less than a half."

It will be observed, in the case decided in the Florida court by Judge MARVIN, cited by Judge LOCKE, his successor in the case of *The Neto,* 15 FED. REP. 819, that in most of the cases arising on the Florida coast there were greater or less losses of property; and that, acting upon his own rule, Judge MARVIN diminished his rewards of salvage with reference to these losses.

Returning now to cases cited by respondent's counsel:

In that of *The Crown,* lost on Ajax Reef, on the Florida coast, 300 bales of cotton being also lost, property to the value of $131,000 was saved piecemeal by a horde of native "wreckers." Here $23,000 was allowed, or one-sixth.

In the case of *The Neto,* 15 FED. REP. 819, the ship was saved, but 500 bales of cotton were jettisoned and lost. The success of the salvors was, therefore, very bad, and Judge LOCKE said that, if there had been means adequate to save all the property at risk, an extraordinarily large salvage could have been paid more easily than a small one could be under the existing circumstances. He therefore awarded, *as* a small salvage, the sum of $9,625. The value of the ship and saved cargo is not given in the report of the case, and we are unable to know the ratio which the award bore to it.

In his opinion in this case of *The Neto,* Judge LOCKE cites, from the records of the Florida court, a number of cases previously decided by

Judge MARVIN, but gives very meager particulars of the facts of them. These records show that in one case, where much property was lost, Judge MARVIN awarded 40 per cent. on a value of $30,000 saved. In another case, where there were "no circumstances of peril," $16,975 was awarded, or 10 per cent. of the value saved. In another case $21,805 was allowed, or one-fourth of the value saved. In another case a vessel was saved which "lay on a smooth and even, though a hard, rocky bottom," and $9,200 was awarded, or 8 per cent. In another case, where the ship rested on a boulder and was rescued from it, $5,700 was awarded, or 18 per cent. In another case, where the vessel rescued was in no great or unusual peril, an eighth of $9,000 was awarded. In another case, where a steamer was pulled off a shoal, and broke her rudder in coming off, so that she had to be steered by a schooner in the rear, while coming into port, $16,000 was awarded, or 10 per cent. In another case $17,500, or an eighth, was awarded for rescuing a vessel from a position of discomfort, but of "comparative safety." In another case an award of 10 per cent. was given on $75,000 worth of cotton saved in a vessel,—30 per cent. on cotton saved when afloat, and 50 per cent. on property saved by diving. In another case the *City of Waco* was saved, when stranded on a rough, rocky bottom, by means of ground-tackle and lightening the ship of her cargo, and an award of $16,000 was made on a supposed value of $250,000. In the case of *The City of Houston*, which the court considered only nominally a case of salvage, an award of $17,500 was made on a supposed value of $400,000. In the case of *The Hector*, laden with $300,000 worth of cotton, which was a case in which much labor was expended under circumstances of very slight risk, $20,000 was awarded. In the case of *The Buoneventura*, which had got among shoals, and when a government schooner had helped her to get out, by aiding with its anchor, and had taken on board 175 bales of cotton, 150 bales having been jettisoned, $3,000 was awarded for the assistance given, the value saved being $200,000. The foregoing are all the cases that were cited by Judge LOCKE in his decision in the case of *The Neto, supra.*

In the case of *The Suliote*, 5 FED. REP. 99, cited by counsel of respondents in the argument at bar, the vessel took fire in the cargo in her hold, while lying at her wharf in New Orleans. The fire was extinguished by three tugs, which came to the Suliote's assistance. There were few, if any, of the ingredients of true salvage in the service, except that the ship was in danger from smothered fire in her hold. There was no danger encountered by the tugs. If the fire had been above-board, the service could have been completed in an hour; but, being in the hold, it required a day or more of time for its complete extinguishment under decks, which was effected by water, hose, and pumps, and by the use of carbonic acid gas. The district court awarded $37,500 on a value of $250,000; but the circuit court, Mr. Justice BRADLEY sitting, reduced the allowance to $19,824.

In the case of *The Swiftsure*, 4 FED. REP. 463, referred to in argument, but not cited in respondent's brief, the ship went ashore north of Cape Charles, uninjured, not very far from the vicinity where. the Egypt was stranded, at about 9 o'clock one May morning, and remained there until 2 P. M., waiting for a tide, her chief officer being drunk. At the latter hour, two strong steam pilot tugs, which were cruising outside the capes looking for a job, took hold of her, drew her afloat, and in three hours got her into the channel coming out from Hampton Roads. The court (Judge MORRIS, of Baltimore) awarded $2,500 for this towage service. The only element of true salvage in the case consisted in the fact that if the vessel, which itself was a strong steamer, with nothing the matter but drunken officers, had not sobered up and steamed off into deep water on that day, the worst might have happened to her in the event a storm should come on. Except as to this prospective danger, the case was one of mere towage. Ship and cargo were worth $125,000.

Coming now to the English cases cited for respondents, the first is the case of *The F. T. Barry*, L. R. 6 P. C. 468–475. The Barry was one of three steamers which were severally engaged in towing the ocean steamer, the Amerique, from where she had been unaccountably abandoned by master, crew, and passengers, to the amazement of the world, and bringing her into the port of Plymouth, England. The ship when found had some water in her, which had to be pumped out. Except this, and that she was found abandoned, the case was one of mere towage. She was brought into port in about three days. The lower court awarded $150,000 on a value of $650,-000. The house of lords reduced the award to $90,000, or $30,000 a day for three days' towing; holding that this was not a case in which a court should make an award of salvage with reference to a proportion of the value saved.

In the case of *The Cleopatra*, 3 Prob. Div. 145, the service was but little more than one of towage. It is true that, when the Cleopatra was discovered by the Fitzmaurice, much difficulty was experienced in making fast to her by hawsers. She was in the shape of a "ship's boiler with a bridge in the middle;" and, when loose in the sea, was much given to rolling over and whirling around. She was a species of hollow raft which had been constructed for the especial purpose of transporting Cleopatra's Needle from the Nile to England. She had been abandoned in the bay of Biscay in a storm by the steamer which had had her in tow. After an effort of an hour and a half an officer of the Fitzmaurice succeeded, at some personal risk, in getting on board and running a line to his vessel. The towing was then easy, and occupied 52 hours. The award was $10,000. The value of the obelisk and her artificial raft, the Cleopatra, was nominal.

In the case of *The Glenduror*, 1 Asp. Mar. Cas. (N. S.) 31, the service rendered was prolonged to a week; but all dangerous work

was done in a single night.   The rest of the service was of the class proper to be compensated on the basis of *quantum meruit*.   Hence, $10,000 was allowed on appeal, on property saved to the value of $270,000; the appellate court being restrained in its allowance, which was conceded to be low, by the illiberal award which had been made by the court below.

In the case of *The Kenmure Castle*, 7 Prob. Div. 47, $20,000 was awarded to one steamer for towing another by sea and partly on the Suez canal for 10 days; the judge saying that the weather was fine, and that there was no danger.

In the case of *The Ville d'Alger*, not yet reported, but tried and decided by Sir ROBERT PHILLIMORE judge of the English court of admiralty, the steamer City of Berlin broke her shaft about midway in the Atlantic ocean.   The Ville d'Alger first took hold of her, and, after towing less than 24 hours, desisted for want of power or of coal. Then the steamer Samaria took hold of her, and towed her into New York, the port of her own destination, in six days.   The amount awarded was $42,500, for seven days towing; of which $2,500 was decreed to the Ville d'Alger.   The City of Berlin had merely broken her shaft, and could have repaired it and come into port unaided, but did not wish to spare the requisite time.   It was a case of mere towage.

I believe I have omitted no case which was cited for the respondents.   Most of them are cases where the service rendered was but little more than that of mere towage; cases in which the amount allowed is always based upon the idea of *quantum meruit*, with no reference to a proportion of the value saved.   They furnish no guide or rule in case of pure and true salvage, where towage is but an incident, and figures only as a winding-up formality after an arduous and difficult salvage service.

Those cases of salvage proper which are cited for respondents are all of them cases in which many of the most important ingredients of a true salvage service are wanting, and they accordingly furnish no guide in determining the awards due in cases where all of these ingredients are prominent and continuing features of the service to be rewarded.   But, even taking these numerous cases as they are, I think their teaching is strongly in favor of liberal awards.   In the towage cases, the amounts decreed are strikingly liberal; and when we consider that the salvage cases cited all either lacked most of the ingredients which constitute a true salvage service, or else are qualified by Judge MARVIN's rule of diminishing the award with reference to the amount of property *not* saved, I think even they fail to enjoin a narrow policy of salvage awards.   They certainly have very little application to a salvage service such as that now under consideration, in which every circumstance constituting true salvage is conspicuously present, and which, moreover, was characterized by a completeness of success almost unparalleled.

Salvage consists—*First*, of an adequate compensation for the actual outlay of labor and expense made in the enterprise; and, *second*, of the reward as *bounty* allowed from motives of public policy as a means of encouraging extraordinary exertions in the saving of life and property in peril at sea. The first of these items of award admits of computation; the second does not, and is usually determined with more or less reference to the value of the property saved. I have said that the salvage service rendered the Egypt is nearly identical in its features with that which was rendered in the case of *The Sandringham*. Yet there are one or two differences between the two. I do not think that the Egypt was in as desperate a condition before she was taken in charge by the salvors as the Sandringham. It is true that the latter lay off Cape Henry life-saving station in direct telegraphic communication with Norfolk, and at a point readily accessible to the wrecking vessels and assistance sent from this city; whereas, the Egypt lay on a desolate coast, 40 miles away from telegraphic and all other overland communication with sources of assistance, amid shoals and sand-bars and shallows, which rendered approach to her by wrecking vessels in midwinter difficult and hazardous. But the Egypt was not, like the Sandringham, swept entirely over by the sea where she lay, and did not thump against the bottom so long or so violently, and had not been abandoned by her crew in the face of danger. When boarded by Capt. Stoddard she still had on her a faithful crew, commanded by a brave and skillful seaman and a true gentleman in the person of Capt. Reavely. The master of the Sandringham lost no opportunity of displaying his entire unfitness, in temper, character, and acquirements, for the responsible position which he held; and his crew during the entire salvage service were, with four exceptions, idle and ill-natured spectators of the brave men who were saving their ship and the property she carried. The crew of the Egypt, on the contrary, though working for wages freely offered them, worked faithfully, and in the spirit of a genuine loyalty to their ship. I think, therefore, that a discrimination ought to be made between the two cases, in the award of the court; and so, whereas a fourth was awarded in lump in the case of *The Sandringham*, I will in this case award a fifth, and add to that amount the sum expended by the libelants in the enterprise, viz., $4,256.55.

I will decree a fifth of the agreed value of the ship and cargo, *plus* the amount of expenses just named.

See *The Sandringham*, 10 FED. REP. 556. and note, 584.