## THE VIOLET BLOSSOM.

### (District Court, D. New Jersey. July 28, 1914.)

SALVAGE (§ 27*)—COMPENSATION—PUMPING OUT LEAKING BARGE.

A barge loaded with copper ore lying in a slip on Sunday was leaking so that the water gained on the four men who were pumping when libelant's tug was called to assist, and in about three hours the water was pumped out and was thereafter kept down by the hand pumps. The barge was not believed to be in immediate danger, and was not in fact, as there were additional men available for pumping and also means for moving her 75 feet to one side, where she would have rested on a mud bank. *Held*, that the service, if regarded as a salvage service, was not of high order, and that an award of $133 was sufficient compensation.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 65, 66; Dec. Dig. § 27.*]

In Admiralty. Suit by Daniel Hunter and others, owners of the tug Florence, against the barge Violet Blossom. Decree for libelant.

Foley & Martin, of New York City, for libelant.
James J. Macklin, of New York City, for claimant.
Harrington, Bigham & Englar, of New York City, for claimant of cargo of ore.

HUNT, Circuit Judge. A sufficient recital of the facts is as follows: Alongside of the dock owned by the United States Metal Refining Company at its plant in Chrome, N. J., and extending out about

325 feet in length and for 50 feet in width, there are 19 or 20 feet of water at low tide. There is also another slip for the accommodation of barges. From the steamship dock over to a certain cribbing there is a distance of 150 feet; adjacent to this crib the bank is mud and soft; at places in the bank the descent is precipitous, at others gradual. Barges have rested on the mud bank at different times. On August 25, 1912, the flat bottom coal barge Violet Blossom, loaded with 810 tons of copper ore, was lying low in about 50 feet from the edge of the steamship dock. It was Sunday. The weather was fair and the wind very moderate. The barge was lying approximately 75 feet from the mud bank in 19 feet of water. She had been leaking when brought in on Saturday night. On Sunday morning four men were pumping. I gather from the evidence that before 12 o'clock on Sunday there were about 3 feet 6 inches of water on the starboard side stern of the barge, and, because of a list, more on the port side. Toward the stern the water was upon the deck, even with the deck on the port side, and at one time the water extended about 10 inches across the deck and in places had a depth of about 2 inches at the rail. The men pumping were not able to keep the water down, whereupon two additional men were put to the pumps and kept even with the incoming water. The pumping by six men seems to have continued from 11 until 12 o'clock. At that time, the yardmaster of the United States Metal Refining Company, concerned evidently for the safety of the barge, ordered that the Florence, which was passing up the sound, be hailed. He says that she was hailed in order to assist in the pumping, as is the usual practice. The master of the Florence says that the man who hailed him asked him if he could pump water out of the barge; that when he started in to pump he thought it was going to be a hard matter, but after working three hours he got most of the water out and left. No bargain was made. Witnesses for the owners of the cargo testify that they did not think the Violet Blossom was going to sink while the six men were pumping the water. After the 2½ hours of pumping by the Florence, 75 tons of cargo were discharged by using mechanical means available for such purposes. It then became comparatively easy to keep the barge free from water, so the number of men kept on the pumps was reduced. There were a good many employés connected with the United States Metal Refining Company, the owner of the copper ore loaded on the barge, and the yardmaster says that he could have called these men out to aid in moving the barge to the mud bank if he had believed that she was really in immediate danger of sinking. It was about 12 o'clock, too, that measures were first taken to get the mechanical crane to lighten the cargo, but it was not until the time that the Florence left that discharging cargo commenced. The foreman says that by pumping he was able to keep up with the incoming water, but in order to obviate holding so many men at work in the night he sent out for the craneman in order to lighten the cargo. At the time the Florence left the water was reduced to about four inches on the starboard side, yet the hand pumps were kept working on the barge. All serious danger had passed, but after the Florence had gone the tug Robinson came up and endeavored to

help. The master of the Violet Blossom was not called as witness, and it appears that at the time of the arrival of the Florence he was of no assistance. Taking the barge over to the mud bank in the event of imminent danger was contemplated, but it was not thought necessary to take such a course, and, as I understand the evidence, there would have been no serious difficulty in moving the barge from where she was at the steamship dock over to the mud flats near the crib. At about 2 o'clock, the tug boat Robinson went to Chrome and passed the Florence, which had left about that time. When the Robinson reached the Violet Blossom they were unloading her and had taken 40 or 50 tons off. The master of the Robinson says that the Violet Blossom then had about 18 inches of water in the stern and had a pump at work. As the pump was gaining on the water, the Robinson left.

Salvage has been defined to be the compensation due to persons by whose voluntary assistance a ship or its load has been saved to the owner from impending peril or recovered after actual loss. It consists of an adequate compensation for the actual outlay of labor and expense used in the enterprise, and of the reward as bounty allowed from motives of public policy as a means of encouraging extraordinary exertions in the saving of life and property in peril at sea. The Egypt (D. C.) 17 Fed. 359.

In Murphy v. Ship Suliote (C. C.) 5 Fed. 99, Justice Bradley said:

"Salvage should be regarded in the light of compensation and reward, and not in the light of prize. The latter is more like a gift of fortune conferred without regard to the loss or sufferings of the owner, who is a public enemy, whilst salvage is the reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic, and daring effort of those who have it in their power to furnish aid and succor. Anything beyond that would be foreign to the principles and purposes of salvage; anything short of it would not secure its objects. The courts should be liberal, but not extravagant; otherwise that which is intended as an encouragement to rescue property from destruction may become a temptation to subject it to peril."

The assistance rendered by the Florence did not involve the doing of any of those unusual acts which generally characterize claims founded upon the law of salvage. The court would not detract from the credit due to the Florence for promptness and efficiency in rendering service while she remained pumping, but it was merely pumping. I doubt whether those in charge of the Violet Blossom believed that she was in most imminent peril, or whether in fact she was, when we consider that with the added number of men put to the pumps before the Florence arrived, any gain of the water was prevented, and that mechanical appliances were available which could have been employed to keep her from sinking. On the other hand, there was no danger to the Florence and no risk incurred by her. The skill, therefore, was but that ordinarily required in pumping, and no unusual risk was taken.

Under all the circumstances there ought not to be a large award in the case. My best judgment is that a just allowance is $133. Decree for that sum, with costs ordered.