## THE RITA.

### CLARKE et al. v. THE RITA.

(Circuit Court of Appeals, Fifth Circuit. May 8, 1894.)

#### No. 176.

SALVAGE—AMOUNT OF COMPENSATION.

While a steamship was at anchor, loading with cotton, fire broke out in cotton already stowed. There being some delay in putting into service the steamship's hose and pipes provided for using steam to suppress fire, she accepted the assistance of a tug lying near, and in about three hours, by the use of the tug's pumps and the labor of her officers and crew, participating with the steamship's appliances and crew and stevedores employed on her, the fire was extinguished. No serious risk was incurred by the tug, her officers, or crew, and the services rendered required no greater skill than her ordinary business. The value of the steamship and cargo was about $194,000. The tug was worth about $15,000, and had seven men, including officers, in her crew, who were paid $480 per month. *Held*, that an award of $1,500 to the tug and an equal amount to her crew was sufficient.

Appeal from the District Court of the United States for the Eastern District of Texas.

This was a libel by Charles Clarke and others against the steamship Rita, for salvage. The district court rendered a decree for libelants. They and certain interveners appealed, assigning as error that the amount awarded was inadequate.

Charles Clarke & Co., a firm composed of Charles Clarke, Robert P. Clarke, and Fred A. Brock, owners of the steam tug Seminole, for themselves and others interested as salvors, filed a libel in the district court of the United States for the eastern district of Texas on October 14, 1892, against the steamship Rita, her machinery, cargo, etc., and alleged that on the 11th of October, 1892, the Rita was at anchor in the Gulf of Mexico, about 3½ miles from the port of Quintana, engaged in loading cotton. That the Seminole had just towed a barge of cotton to the steamer, and made it fast thereto, when it was discovered that the cotton in the upper cross bunkers of the Rita and below the wooden deck was on fire. That about 125 bales were stowed in that place. In response to the alarm, the tug passed her hose aboard the steamer, to aid in extinguishing the flames. The steamer at first refused the assistance, but afterwards hailed the Seminole, and requested help in putting out the fire, it having been found that the steam appliances of the steamer would not work, and that the steamer alone and those on board could not overcome the fire. The tug went to the rescue, putting her hose on board the steamer, and her officers and crew threw water upon the fire steadily for over three hours, until it was subdued, and the danger averted. That, but for such service, it was probable that the Rita and cargo and those on board would have been lost; and, as it was, all were in serious jeopardy, as there were no other means of saving the vessel at hand, and the Rita was unable to make proper steam connections or otherwise to control the fire unaided. In performing this service the efforts of the tug and crew were attended with great labor and hardship, and considerable peril. That such service contributed to save the steamer, which was of the value of $75,000, and about 4,000 bales of cotton, worth $40 per bale, or a total of $235,000. That the

Seminole was of the value of $20,000. That at the time of the fire and the rendition of the services a hard wind was blowing from the eastward, and the sea was running high, thus increasing the danger and difficulty. Salvage compensation was prayed by libelants for their tug and her officers and crew. Certain stevedores on board the Rita at the date mentioned intervened, also claiming salvage, as did the master of the Seminole. The Rita was claimed by the Serra Line of Bilboa, Spain, Adoue & Labit, agents, who answered, denying the existence of any danger to either the Rita or the salvors, and denied that the services rendered were salvage services, and traversed the material averments of the libel, admitting, however, that "said Seminole did tender her services, which were at first declined and afterwards. accepted by the master of said Rita, but not from necessity of peril, but out of abundance of precaution." Upon the hearing a decree was entered March 14, 1893, awarding salvage in the sum of $4,000,—$1,000 to the screwmen, $1,500 to the owners of the Seminole, and $1,500 to her crew, to be apportioned according to their rate of pay. The screwmen abide by the decree, and do not appeal. The other salvors bring the case for review, upon the following assignments of error: "The district court erred in awarding the appellants and interveners salvage to the amount of only four thousand dollars, or three thousand dollars to appellants, the owners of the steam tug Seminole, and their crew, as the sum was inadequate, and disproportionate to the nature and result of the services rendered in saving a large amount of property from destruction by fire; the value of the steamship, equipments, and cargo being over two hundred thousand dollars, and the same being in imminent peril of total loss had it not been for the successful exertions of the salvors in aiding in the extinguishment of the fire. The compensation, under the authorities, should have been about, or not less than, ten per cent. of the value of the property. As it was, the award was less than ten per cent. Appellants were requested by the officers of the steamship to come to her aid and rescue, and under the evidence were entitled to a much larger award."

The Rita cost and was worth about $58,000. Her capacity was 5,500 bales of cotton. She had been partly loaded at the port of Velasco with 3,400 bales of cotton, but was compelled to go across the bar at the mouth of the Brazos river, and complete her loading in the Gulf of Mexico. The Seminole, worth about $15,000, towed out a barge load of cotton of some 600 bales, and, delivering it on the lee side of the vessel, had dropped a cable's length astern, to await the unloading of the barge, which she was to tow back to port. The tug had also brought the screwmen out, who had just commenced work, when the fire was discovered in the cross bunkers, at a point in the cotton already there stowed, which indicated that it had been smouldering there. The steamer's hose was, after some little delay, put into use, but without a nozzle, as it could not be found. The Rita was provided with a system of tubing or pipes through which steam was designed to be conveyed into the holds of the vessel for the purpose of suppressing fires, but this had been cut off by a flange that had been inserted in the pipe on deck, where it was covered by a box, and the bolts could not be removed by a wrench, and were required to be cut off with chisels before the flange could be taken out, and the circulation of the steam allowed, all of which occupied considerable time, the evidence as to the length of time varying from a few minutes to over an hour. The barge had been secured to the port or lee side of the vessel, and the Seminole was compelled to go upon the starboard side of the steamer to proffer her assistance, as service from the further side of the barge, owing to the distance, could not have been so effective. In so doing, she was exposed to some risk of injury from striking against the steamer. The mate of the Rita refused the hose of the Seminole, and threw it overboard, but shortly thereafter, when it was found that the steam could not be put into service promptly, and that the fire was gaining, the Rita hoisted her flag at half-mast, which was a signal of distress, or call for help, and her master then accepted the assistance of the Seminole, whose hose, from a double-acting pump, throwing 600 gallons per minute through a nozzle, was directed into the hatch and towards the fire, but the height of the combing, and the location of the fire back of the hatch, prevented its being effectively reached by the streams from the two vessels, and upon the advice of Capt. Carroll, of the Seminole, two holes were cut in the deck of the Rita, and through these the streams

were directly played upon the burning cotton below, so that men could go down and break out the cotton. When the steam was at last gotten to work, it was of little or no benefit, as the air could not be excluded from the bunkers, there being openings in the lower hatch, and the two holes in the deck and the upper hatch were only partly covered. There were also other air passages in the after part of the bunkers. The officers and crew of the Seminole assisted in handling the hose, and rendered all the service possible in extinguishing the fire, which, after about two hours' work, was under control, and a little later the cotton was broken out of the bunkers, and hoisted on deck, where the fire could be better dealt with. The upper cross bunkers where the fire occurred contained coal on the inward voyage. The Rita was of iron, the upper deck wood, and about 2,000 feet of lumber had been placed in this bunker, to keep the cargo clean which was to be stowed therein on the return trip. On the floor was a hatch about five feet square, covered with boards loosely placed together, but not caulked. This hatch led into the lower coal bunker, which contained about 140 tons of coal and was nearly full. Cotton compactly stowed stood upon the boards, which, when the fire was out, were found to be burned nearly through. Some of the water thrown into the hold had gone through the hatch to the lower bunker. The fire was confined to the upper bunkers, where there were 118 bales, all of which had been stowed—that is, screwed tightly into position—except about 5 bales. It could contain 200 bales. On the starboard side a wing of several bales had been stowed up against the bulkhead which separated this from No. 2 hold, and was five-eighths of an inch in thickness. In the lower No. 2 hold there were about 1,000 bales of cotton stowed, and the hatch between that and the upper hold was open, and it could not be closed, as it was packed with cotton projecting above it. There were some loose bales in upper No. 2 hold, and two tiers of bales stowed and screwed into position against the bulkhead next to the bunker where the fire was. This cotton had to be broken out by the screwmen with their tackle as the fire progressed, to prevent its communication to the No. 2 hold, which would have involved directly 1,000 bales, with the possibility of spreading to the rest of the vessel. The crew of the Seminole was composed of seven men, including officers, with a pay roll of $480 per month. The evidence does not show that the Seminole was in any wise injured, or that in rendering the services to the Rita she ran any other or greater risk than in following her ordinary business of towing. The officers and crew of the Seminole, in assisting on board the Rita, were exposed to discomfort from heat and smoke, but were exposed to little, if any, danger.

James B. Stubbs, for appellant.

A. R. Campbell, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

PARDEE, Circuit Judge (after stating the facts). "Salvage, in its simple character, is the service which volunteer adventurers spontaneously render to the owners in the recovery of property from loss or damage at sea under the responsibility of making restitution, and with a lien for their reward." Macl. Shipp. 608. "Salvage is the compensation due to persons by whose voluntary assistance a ship or its lading has been saved to the owner from impending peril, or recovered after actual loss." Ben. Adm. § 300. "Salvage consists of an adequate compensation for the actual outlay of labor and expense used in the enterprise, and of the reward as bounty allowed from motives of public policy as a means of encouraging extraordinary exertions in the saving of life and property in peril at sea." The Egypt, 17 Fed. 359. "The amount awarded as salvage comprises two elements, viz.: adequate remuneration,

and a bounty given to encourage similar exertions in future cases, the relative amount to depend on the special facts and merits of each case." The Sandringham, 10 Fed. 556. "The leading considerations to be observed in determining the proportion or amount of an award for salvage services are well defined. * * * We are to consider (1) the degree of danger from which the lives or property are rescued; (2) the value of the property saved; (3) the risk incurred by the salvors; (4) the value of the property employed by the salvors in the wrecking enterprise, and the danger to which it is exposed; (5) the skill shown in rendering the service; (6) the time and labor occupied. These are the ingredients which must enter, each to a greater or less degree, as a sine qua non, into every true salvage service." The Sandringham, supra. In the case of the Rita the degree of danger from which the property was rescued is not clearly ascertainable from the evidence; and, from our consideration of it, we are unable to say whether, without the services of the Seminole and her crew, the master and crew of the Rita would have been able to control the fire, and with little damage to property. The master and other officers of the Rita are vigorous in their depositions to the effect that without the Seminole and her crew the fire on board the Rita would have been seasonably controlled, and with little damage to property. The value of the property, more or less in jeopardy in the case, was about $194,000. The Seminole was worth about $15,000, and, in our view of the evidence, the said tug incurred no serious risk, nor did the officers and crew of the Seminole incur any risk of life or limb, though, it is true, they were exposed to discomfort from heat and smoke. The skill shown in rendering the services on the part of the officers and crew of the Seminole was the ordinary skill to be expected of competent and energetic men engaged in the towage service. At the outside, during three hours, the use of the pumps of the Seminole and the labor of her officers and crew were fully given to the assistance of the Rita and her cargo, and there is no doubt that they rendered faithful, efficient, and successful services. If it is to be considered that the Rita and her cargo were saved from total loss by fire by the services rendered on the occasion in question, it must also be considered that in the work done to extinguish the fire, not only the Seminole and her officers and crew were engaged, but that all the appliances of the Rita herself, with her master, officers, and crew, and about 35 screwmen or stevedores, participated, and that it would be unjust to credit the Seminole and her officers and crew with all the meritorious services. If the Seminole and her officers and crew were paid only upon a quantum meruit for actual work and labor performed, their outside recovery would not be over $150. By the decree complained of, the owners of the Seminole, whose property incurred no serious risk, are given ten times the amount of $150, a sum certainly equal to 15 days' gross earnings of their tug. The officers and crew of the Seminole, for three hours' labor, are each of them awarded a sum equal to, if not exceeding, three months' full pay. From this it is easily seen that the award of the court below com-

prises not only adequate remuneration, but a large bounty, sufficient to induce others, on a proper occasion, to "go and do likewise." We think the reward allowed fully meets all the objects and purposes contemplated by the law, and that a larger amount would have been an improper exercise of judicial liberality. Unless the appellants are to be rewarded beyond their own merits, and because of the misfortune of the Rita, they have no reason to complain of the decree in this case. The decree appealed from is affirmed.