## THE CATALINA.

(Circuit Court of Appeals. Fifth Circuit. December 18. 1900.)

### No. 963.

**1. Salvage—Character of Services—Vessel in Distress.**

Where a steamship in the Gulf of Mexico, 60 miles from the mouth of the Mississippi, was disabled, by the breaking of her shaft, beyond any temporary repairs that could be made, and in need of assistance to reach her port, although not in immediate peril, she was so in distress that aid voluntarily given her by towing her to the mouth of the river constituted salvage services.

**2. Same—Amount of Compensation.**

The Catalina, a large Spanish steamship valued at $200,000, while in the Gulf of Mexico, on her way in ballast from a Mexican port to New Orleans, broke her propeller shaft beyond temporary repair. She attempted to proceed by sail, but was becalmed about 60 miles from the mouth of the river, and during the night signaled the Olympia, a steamship bound outward in ballast, for assistance. By agreement, the Olympia undertook to tow her to the South Pass, the amount of compensation to be determined later. The crew of the Catalina delivered a hawser on board the Olympia, and the towage was performed in safety, the weather being calm and the sea smooth. The Olympia was delayed by the service about 24 hours. She was a vessel worth $75,000. *Held,* that the service rendered was properly a salvage service, and entitled to be compensated as such, but was not of a high order of merit; that as the service contracted for was merely towage, which was performed without risk to the Olympia or her crew, it should be compensated on the basis of the value of such towage, an equal amount to be added as salvage compensation; and, it appearing that $50 per hour was full compensation for the towage, an award of $2,400 should be made.[1]

Appeal from the District Court of the United States for the Eastern District of Louisiana.

George Denégre and J. P. Blair, for appellants.
W. W. Howe, C. P. Cocke, and W. B. Spencer, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge. This is a libel for salvage, and the appellants have brought the case to this court complaining of the amount awarded. It appears that on or about November 15, 1899, the Spanish steamship Catalina, a large, well-appointed steamship, of the value of

[1] Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

about $200,000, left the port of Barcelona, with a general cargo for sundry ports in Canary Islands, Puerto Rico, Cuba, and Mexico, and, having discharged the last of her cargo at Tampico, left that port in ballast for the port of New Orleans. While on her course, some 80 or 90 miles off Southwest Pass, her shaft broke, thus disabling her as a steam vessel. The shaft and propeller were secured, and the Catalina undertook to proceed, directing her course more to the eastward, towards the usual course of vessels plying between the ports of New Orleans and Cuba and Central America. The weather and sea were calm, and the wind light. On the 12th of January the wind died down, and the Catalina was temporarily becalmed; and when in latitude 28° 8′ N., and longitude 88° 39′ W., at a distance of about 60 miles south of east from South Pass, at the mouth of the Mississippi river, at about 9:30 p. m., she sighted, at a distance of about 7 miles, the steamship Olympia, a steam vessel of about the value of $75,000, bound in ballast from the port of New Orleans to Port Limon, Costa Rica. The Catalina signaled with Bengal lights. The Olympia changed her course slightly to meet her, and when at the distance of about 3 miles answered the signals. The Olympia then approached within about 1,000 yards of the Catalina, and the master and first officer of the Catalina went aboard in a boat, and asked the captain of the Olympia to tow the Catalina to the mouth of the Mississippi river. Thereupon, after a consultation between the master of the Olympia and his officers, an agreement was made and reduced to writing as follows, to wit:

"United Fruit Company Steamship Lines. Steamship Olympia. At Sea.
"Thurs., Jan. 12th, 1900, at 10:45 p. m.

"Position: S., 28° E.,—60 miles from South Pass Light Vessel.

"It is hereby agreed between Captain Higinio Andraca, of the S. S. Catalina, now disabled, and Captain Edmund J. Seiders, of S. S. Olympia, that the latter tow the former to a safe anchorage at the mouth of the Mississippi river (South Pass). All renumeration (remuneration) for this service to be decided by arbitration in New Orleans. The arbitrators to be selected in part by the managers of the United Fruit Company, and in part by those representing the owners of the disabled ship.

"[Signed]                                          Higinio Andraca.
"[Signed]                                          E. J. Seiders.

"Witness: [Signed]  W. S. Amoss, Purser Olympia."

Thereupon, the Olympia coming within the distance of about 300 yards from the Catalina, a hawser of the Catalina was carried aboard by the crew of the Catalina, made fast on the Olympia, and the towage service commenced. The weather was calm and pleasant, the sea also, and the towage service went on without incident until about 12:45 p. m. of the 13th of January, when, near South Pass, the Olympia stopped to take on pilots, and then, starting abruptly, the hawser parted. Thereupon the Catalina furnished another hawser, delivered it aboard the Olympia, and the towing proceeded until about 2 p. m., when the Catalina was left in a condition of safety at South Pass, and the Olympia resumed her voyage; having been detained by the services rendered to the Catalina from 22 to 24 hours.

It seems that the stipulation for arbitration was abandoned, and

the libel in this case was filed. There is very little, if any, conflict in the evidence. The judge of the lower court rendered the following "Reasons for Judgment":

"This cause having been submitted on the evidence, and after arguments of counsel, the court finds: The court thinks this is clearly a case of salvage. The steamer had broken her shaft, and was without sufficient sails to make steering way; and in the month of January, in the Gulf of Mexico, in that condition, she was in need of assistance. She was in distress. She so signaled, and received the necessary aid. The late Judge Billings, in the case of The Delhonde, very properly says that a vessel in the Gulf of Mexico with a broken shaft or propeller is at the mercy of the elements, because the Gulf of Mexico is a dangerous water. It is true that both of the vessels in this case were in ballast and without passengers, and that there was no evidence of immediate or imminent peril. There was little or no immediate danger to the officers or crew of either of the vessels. Had there been, the award in this case would necessarily have been much larger. The award, in view of the value of the salved property ($200,000), is not large, and its payment will not be onerous upon the owner of the steamer; yet the amount given will be sufficient to accomplish the purpose in such cases, to wit, to cause the officers and crews of salving vessels or any other mariners to go promptly and eagerly to the rescue of any vessel so disabled in future. The court awards $6,000 to the salvors, one-third of this amount to the officers and crew, in proportion to their wages, and the balance to the owners of the vessel."

On this decree the following errors are assigned:

"(1) The court erred in holding that the services herein were salvage services. (2) That the court erred in allowing libelants more than a liberal compensation pro opere et labore; that the amount fixed as compensation for the services performed by libelants, six thousand dollars, is more than ten times the actual value of the services estimated pro opere et labore, and six times more than the value of such services considered and valued as salvage services."

The Catalina was disabled in the open Gulf beyond any temporary repairs that could be made upon her machinery, out of reach of ordinary towing vessels whose help she needed, and, while in no immediate or proximate danger, was in need of outside assistance to reach port. To have trusted to her sails would have been to incur needless delay and danger, and risks from possible, if not probable, changes in the weather. We may say here, as we said of the Dupuy de Lome with her broken propeller-shaft (Compagnie Commerciale de Transport a Vapeur Francaise v. Charente S. S. Co., 9 C. C. A. 292, 60 Fed. 921): This ship "was so far disabled as to be in need of assistance to enable her to complete her voyage, and, although not in immediate peril, was so in distress as to justify the use of the word 'salvage' in designating the aid she required." The first assignment of error is therefore not well taken.

In The Rita, 10 C. C. A. 629, 632, 62 Fed. 761, 763, this court declared in regard to salvage principles as follows:

" 'Salvage, in its simple character, is the service which volunteer adventurers spontaneously render to the owners in the recovery of property from loss or damage at sea, under the responsibility of making restitution, and with a lien for their reward.' Macl. Shipp. 608. 'Salvage is the compensation due to persons by whose voluntary assistance a ship or its lading has been saved to the owner from impending peril, or recovered after actual loss.' Ben. Adm. § 300. 'Salvage consists of an adequate compensation for

the actual outlay of labor and expense used in the enterprise, and of the reward as bounty allowed from motives of public policy as a means of encouraging extraordinary exertions in the saving of life and property in peril at sea.' The Egypt (D. C.) 17 Fed. 359. 'The amount awarded as salvage comprises two elements, viz. adequate remuneration, and a bounty given to encourage similar exertions in future cases, the relative amount to depend on the special facts and merits of each case.' The Sandringham (D. C.) 10 Fed. 556. 'The leading considerations to be observed in determining the proportion or amount of an award for salvage services are well defined. * * * We are to consider (1) the degree of danger from which the lives or property are rescued; (2) the value of the property saved; (3) the risk incurred by the salvors; (4) the value of the property employed by the salvors in the wrecking enterprise, and the danger to which it is exposed; (5) the skill shown in rendering the service; (6) the time and labor occupied. These are the ingredients which must enter, each to a greater or less degree, as a sine qua non, into every true salvage service.' The Sandringham, supra."

In the instant case the award made in the district court seems to have been based almost wholly upon the value of the salved property, and with the view of making a considerable reward to the salvors, in the main disregarding the other elements of salvage, and particularly the character and risk of the services actually rendered. The services required by the Catalina were simple towage services; those applied for and those contracted for and furnished by the Olympia were simple towage services. The Olympia was not required to and did not approach the Catalina within any dangerous distance. The hawsers of the Catalina were put aboard the Olympia by the crew of the Catalina, and we are unable to perceive that the services rendered to the Catalina by the Olympia were attended with any extra risk not accompanying ordinary towage, except that they were rendered by a ship not constructed for, nor engaged in, the towing business. It may be that the services rendered were enhanced by the fact that the Olympia, to render them, made a deviation in her voyage; but she was in ballast, and we find nothing in the record to show that she suffered any damage or great inconvenience therefrom. While we agree with the district court in holding that the services rendered were salvage services, we are clearly of opinion that they should be held to be salvage services of a low order, and be compensated on the basis of towage services. We find no evidence in the record tending to show the value of towage services rendered large steamships in the open Gulf, but in other records we are advised that $25 per hour is a liberal compensation. As the Olympia was not constructed for, nor engaged in, the towage business, we think we may safely estimate the value of the towage services rendered to the Catalina at $50 per hour, and doubling this, to accent and reward the same as salvage services, will make $100 per hour, and considering that the Olympia was detained about the business 24 hours will guide in fixing the proper allowance at $2,400. This amount doubly pays for the services actually rendered, and it is sufficiently large to carry into effect the principles involved in salvage compensation.

As to the distribution of the amount allowed between the owners and the crew, no appeal has been taken, and we infer that the rule adopted, two-thirds to the owners and one-third to the master and

crew, is satisfactory to all the parties concerned. The judgment of the district court is reversed, and the case is remanded, with instructions to enter a decree in favor of the libelants, and against the claimants, for the sum of $2,400 and costs; the costs of this court, including cost of transcript, to be paid by the appellees.