THE CRASTER HALL.

(Circuit Court of Appeals, Fifth Circuit. April 14, 1914.)

No. 2567.

1. COURTS (§ 89*)—SALVAGE—PRECEDENTS—AMOUNT OF AWARD.

Adjudged cases are of little assistance in determining the amount of a salvage award, which must depend on the special facts and merits of each case.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 311, 312.; Dec. Dig. § 89.*]

2. SALVAGE (§ 30*)—AMOUNT OF AWARD—RESCUE OF STRANDED STEAMSHIP.

An award of 5 per cent. of the value of a steamship and her cargo and freight, which aggregated about $500,000, for salvage services affirmed, where she was stranded in quicksand, exposed to the open ocean in January, and the danger and difficulty of moving her was constantly increasing, the weather was cold, and the work dangerous, owing to high winds and rough seas, the salving vessels were five in number, valued at $155,000, some of which were engaged during parts of three days, and the

———

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

work was so successfully done that there was no loss or injury to either vessel or cargo.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 72–74; Dec. Dig. § 30.*

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

Appeal from the District Court of the United States for the Southern District of Georgia; Emory Speer, Judge.

Suit in admiralty by the Propellor Towboat Company of Savannah, the Pilots Navigation Company, and others, against the steamship Craster Hall. Decree for libelants (203 Fed. 188), and claimant appeals. Affirmed.

Charles R. Hickox and Convers & Kirlin, all of New York City, and Wm. R. Leaken, of Savannah, Ga., for appellants.

Wm. Garrard and A. Minis, both of Savannah, Ga., for appellees.

Before PARDEE and SHELBY, Circuit Judges, and MAXEY, District Judge.

PARDEE, Circuit Judge. The libel alleges, the answer admits, and the proof shows, that the services rendered by the libelants in floating the Craster Hall in January, 1912, when she was aground on Gaskin's Bank to the northward of the Tybee Roads were salvage services, and the contentions here are as to the grade thereof and the amount of award.

The District Court allowed 5 per cent. on the value of the ship, cargo, and freight. On this appeal the appellants demand a reduction, the appellees ask for an increase of the amount allowed.

[1] To determine whether services rendered to a ship in peril are strictly salvage services, and whether salvors are entitled to be rewarded therefor in the admiralty, adjudged cases are of great help in reaching a correct decision, and the same may be said as to many other questions arising in salvage cases; but, where the amount of award is the only vital question, very little assistance is obtained by study and analysis of the facts in other salvage cases.

In The Rita, 62 Fed. 761–763, 10 C. C. A. 629, decided by this court in 1894, we find the definition of salvage and the principles involved in determining the amount of salvage awards as follows:

" 'Salvage, in its simple character, is the service which volunteer adventurers spontaneously render to the owners in the recovery of property from loss or damage at sea under the responsibility of making restitution, and with a lien for their reward.' Macl. Shipp. 608. 'Salvage is the compensation due to persons by whose voluntary assistance a ship or its lading has been saved to the owner from impending peril, or recovered after actual loss.' Ben. Adm. § 300. 'Salvage consists of an adequate compensation for the actual outlay of labor and expense used in the enterprise, and of the reward as bounty allowed from motives of public policy as a means of encouraging extraordinary exertions in the saving of life and property in peril at sea.' The Egypt [D. C.] 17 Fed. 359. 'The amount awarded as salvage comprises two elements, viz.: Adequate remuneration, and a bounty given to encourage similar exertions in future cases, the relative amount to depend on the special facts and merits of each case.' The Sandringham [D. C.] 10 Fed. 556. 'The leading consid-

erations to be observed in determining the proportion or amount of an award for salvage services are well defined. * * * We are to consider (1) the degree of danger from which the lives or property are rescued; (2) the value of the property saved; (3) the risk incurred by the salvors; (4) the value of the property employed by the salvors in the wrecking enterprise, and the danger to which it is exposed; (5) the skill shown in rendering the service; (6) the time and labor occupied. These are the ingredients which must enter, each to a greater or less degree, as a sine qua non, into every true salvage service.' The Sandringham, supra."

[2] Considering the ingredients which must enter as a sine qua non into every salvage service in the order named, we find that the case shows:

I. The danger from which the Craster Hall was rescued was very great and really imminent. She was so hard and high aground on a sand bank exposed to the open ocean that at high tide she could not be floated with her own engines assisted by a powerful tug. The bottom was of quicksand of the variety that, stirred up with the incoming tide, settles with the ebb tide, forming a hard bottom, so that at every tide a stranded vessel works further in shore, rendering ultimate relief more difficult. Similar sands are described by Judge Hughes in The Sandringham, supra:

"There is some contradiction in the evidence as to whether or not the bed on which the ship lay after she was beached was a *quicksand.* Admiral Smyth, in his Dictionary of Nautical Terms, defines this to be 'a fine-grained, loose sand, into which a ship sinks by her own weight as soon as the water retreats from her bottom.' It is immaterial what name we apply to the sand off Cape Henry. The fact is that there, and all along the coast southward for several hundred miles, the sand is a fine, movable substance, which, when a heavy body is resting upon it, retreats from under it by the action of the currents of the ocean which there constantly prevail, leaving a bed into which the body sinks deeper and deeper the longer it remains in the position. There is no possibility of any substance which, in specific gravity, is too heavy to float upon the surface of the water being lifted out of its bed in this sand and floated upon the shore. All the vessels that are beached upon the sands of this long coast invariably continue to sink, deeper and deeper, until they disappear from sight under the sea into the sand.

"The fate of the United States steamship Huron, wrecked off Kitty Hawk, November 27, 1876, was a notable historical exemplification of this characteristic of the sands of this part of the coast."

Stranded as the Craster Hall was on sands of such character, with a probability that, unless quickly relieved, her position would be made worse, with every tide her peril was increased by the probability, strong at that season, that the winds favorable at the time might change to very unfavorable and come from such a direction and with such force as to be disastrous. The District Judge says on this point (203 Fed. 188), and the weight of the evidence is with him:

"Now, with the long experience the court has had with this coast and the dangers of its navigation, we are very clear that this fine vessel was in a highly hazardous situation. Twenty-four hours, or half of twenty-four hours, two hours even, might have made it impossible to extricate her from that position with all the power which could have been exerted, and hers would have been the fate of the melancholy list of ships which have gone ashore on these treacherous sands, known not as the learned proctors for libelant would term it, 'The Norwegian Graveyard,' but 'The Graveyard of the Atlantic.' * * * She was relieved in the very nick of time. Next day the wind changed to the east, and the Atlantic rollers, with nothing to impede them

between Tybee sands and the coast of Morocco, would have soon made sad work of the Craster Hall. A day later it is quite doubtful that she would have gotten off at all."

II. The value of the property saved is agreed to be:

| | | |
|---|---|---|
| Ship | $194,660 | 00 |
| Cargo | 276,506 | 69 |
| Freight | 26,228 | 56 |
| Total | $497,395 | 25 |

III. If the weather had been ordinarily mild and pleasant, the risk to the crews of the salving vessels would have been some but not much more than in the ordinary service of towing and piloting; but the witnesses testify that the weather was extremely cold for the latitude, the temperature mostly freezing, ranging from 21 to 40 degrees Fahrenheit, accompanied with snow flurries, ice on the deck and rigging, high winds and rough seas, and thus the services rendered day and night were accompanied with decided risk and peril to the salvors, particularly as they were on numerous tugs maneuvering around the ship.

IV. The value of the property employed in the salvage services was as follows: Cynthia No. 2, $30,000; Cambria, $25,000; McCauley, $35,000; Jacob Paulsen, $25,000; and the pilot boat J. H. Estill, $40,-000; making a total of $155,000. And the danger to which these tugs were exposed was, considering the rough sea, the high winds, the necessity of speedy action and co-operation, decidedly hazardous.

"In estimating the degree of danger, regard should be had to the damage sustained by the vessel itself, the nature of the locality from which she was rescued, the season of the year when the services were rendered, and, if the weather at the time was not tempestuous, the probability of its becoming so, and the ignorance or knowledge, as the case may be, of the master or other person on board the vessel." The Sandringham, supra.

V. The salving vessels worked in harmony under the direction of the pilot in charge of the salving operations; the services rendered were skillful, as fully shown by the fact that the Craster Hall was speedily floated and conveyed to safe anchorage without any injury to ship or cargo.

Appellants criticise the skill of the salvors in that they did not from the first put out an anchor from the Craster Hall to hold her from going further on the sand bank and to pull on with the ship's power in working the ship off the bank into deeper water; but the criticism has little merit. There was no suggestion from the master or officers of the Craster Hall that an anchor should be put out. The putting out of a sufficiently heavy anchor would have been under the circumstances as shown by the evidence an extremely difficult matter, and there is evidence tending to show that the ship was not well enough supplied with strong hawsers to have made the anchor useful if put out; and, beside all this, the plan of the salvors to pull the Craster Hall off of the bank produced quicker results, and it was eminently successful.

The claimants' answer raises the contention, and there was evidence offered to show, that the salvage of the Craster Hall might have been

accomplished by lightering the cargo. In regard to this, it is only necessary to say that the weather and seas did not permit at the time of successful lightering, and it could only have been accomplished through a delay, during which the ship would have been in much peril, and at a cost and expense probably exceeding the salvage award. Besides this, the cargo was nitrate of soda in bags which, if taken out and put into barges, would have been very liable to damage by dampness, and, while it ordinarily contains one-half of 1 to 2 per cent. moisture, it is considered damaged if it contains as much as 5 per cent.

The evidence further shows that the Standard Fuel Supply Company, making the offer on Monday, January 15th, to lighter a sufficient cargo to float the steamer, was not supplied with sufficient barges to have accomplished the same at the time and under the circumstances without great delay.

VI. The time covered by the salvage operations was from Sunday night to Tuesday morning for the J. H. Estill, from Monday to Tuesday morning for the Jacob Paulsen, from Monday midnight to Tuesday morning for the Cambria and McCauley, and from Monday to Wednesday 6 a. m. for the Cynthia; this tug having assisted the Craster Hall from anchorage off Tybee to dock in Savannah.

The four last-named boats were powerful tugs, well equipped with salving appliances, and carried crews of seven experienced men. The J. H. Estill was a powerful pilot boat, carried a master, four sailors, two firemen, and twelve pilots, making forty-seven the total number of men employed in the salvage operations.

We have given much consideration to the evidence in this case, and on the facts and circumstances developed, and having in mind the principles which govern courts of admiralty in allowing salvage awards, we reach the conclusion that the amount allowed by the District Court is not excessive to any such degree as would warrant this court to reduce the same.

Whether on this appeal, and in the absence of a cross-appeal, we have jurisdiction to increase the award to salvors should we find the amount inadequate, it is not necessary to decide.

The decree appealed from is
Affirmed.