THE TORDENSKJOLD.

THE TAGGART BROTHERS.

(Circuit Court of Appeals, Fifth Circuit. February 8, 1919.)

No. 3275.

SALVAGE ⬥30—RESCUING STRANDED STEAMSHIP—AMOUNT OF COMPENSATION.
    An award of $40,000 salvage, to a tug valued at $85,000 for releasing a steamship worth, with cargo, $1,000,000, stranded off the Florida coast, *held* excessive, and reduced to $10,000; the service, which required the most of two days, being rendered in fair weather and with little danger.

Appeal from the District Court of the United States for the Southern District of Florida; Rhydon M. Call, Judge.

Suit in admiralty by Thomas S. Davis, master of the tug Taggart Brothers, against the Norwegian steamship Tordenskjold; Anders Kjole, master, claimant. Decree for libelant, and claimant appeals. Modified and affirmed.

For opinion below, see 253 Fed. 273.

This is an appeal from a decree against the claimant of the Norwegian steamship Tordenskjold and its cargo and the claimant's surety,

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

awarding $40,000 and costs to the owner and the master and crew of the tug Taggart Brothers; the decree providing for the payment of two-thirds of the amount awarded to the owner of the tug, and that the remaining one-third be distributed among the master and crew of the tug in proportion to the wages of each, as set forth in the libel. The opinion rendered by the District Judge (253 Fed. 273) contains the following statement:

"The Tordenskjold, a Norwegian steamer, left the port of Newport News, October 22, 1917, loaded with approximately 5,500 tons of coal, bound for Havana. On the evening of October 26, about 5:30 o'clock, she grounded some 14 miles south of Hillsborough Light, on the Florida coast. The American tug Taggart Brothers, bound from Brunswick to Havana, with two barges, Louis H. and Martha T., having encountered heavy weather, and running short of coal, had anchored the Louis H. in the bight south of Cape Canaverel and the Martha T. opposite Palm Beach, and gone into Miami to get coal. On October 27 a fishing boat notified the captain of the tug that the steamer was ashore and the captain had sent him for assistance. There was another tug, the Resolute, in the harbor of Miami; but she declined to go to the assistance of the stranded ship. Thereupon the Taggart Brothers, after receiving her coal, proceeded to the ship·and offered to assist, arriving there between 7 and 8 o'clock in the evening and offering to assist in floating the steamer. This offer was accepted, and being informed that the tide was out, and nothing could be done until high water, the tug lay alongside until next morning, when at high water a hawser was passed to the ship and made fast to the stern bitts, and the tug pulled for something like three hours or more, but could not float her. The only effect was to swing the stern of the ship from west to east; the ship being aground at high water at about hatch No. 2, forward of amidships. About 8 o'clock in the morning of the 28th, the tug, with the consent of the captain, of the ship, left to pick up her barges, promising to return for the high water next morning. Finding he could not pick up both barges and return for the morning tide, the tug picked up the Martha T. and returned the morning of the 29th at about 3 o'clock, anchoring the Martha T. a short distance from the ship, and again passed his hawser over the stern of the ship and began to pull, and the ship came off the shoal stern first; the hawser was then passed to the bow and made fast to the forward bitts, and the bow pulled around. After the ship was floated, she grounded again and was again pulled off, and finally towed into deep water, where the mate of the tug was put aboard and she proceeded to Key West. The tug then picked up the Martha T. and anchored her near Cape Florida, and proceeded herself to Miami.

"When the ship first grounded a 2,000-pound anchor was run out about 80 fathoms from the port bow. The officers of the ship claim that the ship first grounded on the 26th at the stern, and by the use of this anchor and the ship's engines, she was floated at high tide on the morning of the 27th and took the shore again. However this may be, there is no question that at the time she took the ground the first time she was proceeding at full speed, and that there was deep water to the east of the reef on which it is claimed she first grounded. The claim that she took the ground so gradually and slowly that one did not realize it, in the light of these admitted facts, seems, to say the least, highly improbable.

"There is a sharp conflict between the testimony of the libelants and claimant' of what occurred. Taking all the testimony, it seems to me that the situation was about as follows: The ship was ashore upon an inner reef, there being sufficient water between to float the ship and a channel through the outer reef to deep water. There was only some 250 feet between the two, and the ship from her position did not have steering room to make this channel, had she been able to float herself by jettisoning her cargo, and using her engines. There can be no question that any ship ashore on the Florida Reefs, exposed as this one was to the full force of the sea during the months of September and October, is in great peril. It is true that during the opera-

tions the weather was fine and the seas light, so light that the tug could lay alongside the ship; but nevertheless the position of the ship was one of extreme peril, and it is proper that the court should consider this in arriving at a proper award of salvage. The assistance was promptly and efficiently rendered, and without assistance I am satisfied that she would have been unable to extricate herself. She was ashore from the evening of the 26th to the morning of the 29th, and no effective assistance tendered, except that of this tug; and going to show that she was hard aground is the condition of her plates and the repairs made necessary by this accident.

"Stress was laid on the fact that the tug left the ship for about 19 hours to go for the barges, thereby abandoning the ship; but this was done with the consent of the captain of the ship and with the promise to return the next morning, and the tug did return in time for the morning high water, at which time the ship was floated. Testimony was taken of the value of the ship and cargo, and taking the lowest of these valuations, the value of the property saved was at least $1,000,000; the value of the cargo being about $55,000, and that of the ship $945,000. The value of the tug may be stated at $85,000. * * * There were no elements of heroism or danger to life in the instant case. The only danger to the tug was such as was incident to going to the ship ashore, which in this case was slight, and no damage was suffered except such as was incidental to pulling on the tug's hawser."

G. Bowne Patterson, of Key West, Fla., and E. O. Locke, of Jacksonville, Fla., for appellant.

W. Hunt Harris, of Key West, Fla., for appellees.

Before PARDEE and WALKER, Circuit Judges, and GRUBB, District Judge.

WALKER, Circuit Judge (after stating the facts as above). The above-quoted statement, made in the opinion rendered by the District Judge, sufficiently discloses the state of facts upon which the decree appealed from was based. The evidence does not leave it fairly open to question that a meritorious salvage service was rendered. For that service such an amount should be awarded as is enough to cover an adequate compensation for the labor and expense which the enterprise required of the tug and its officers and crew, and also a reward allowed as a bounty in pursuance of the public policy of encouraging preparation for and the making of voluntary exertions for the saving of imperiled ships and their contents; the amount of such reward depending upon the special facts and merits of the service rendered. The Craster Hall, 213 Fed. 436, 130 C. C. A. 72; The George Hawley, 242 Fed. 473, 155 C. C. A. 249. We do not think that, in view of the attending circumstances, the service rendered justified the award which was made. The value of the property saved made it proper to award more than should have been awarded if that value had been greatly less. But the award should be materially less than it properly might have been if the service rendered had involved great peril or serious loss or damage to the tug or its equipment or tows, or grave danger, heroic effort, or unusual hardships to its officers or crew. The amount of the award made indicates that undue weight was attached to the value of the property saved, and that there was a lack of due consideration of the absence of such attending circumstances as would justify the liberality evidenced by the decree. In view of the value of what was saved and of that employed in the rescue, of the time, labor,

and expense involved in the service, and of all the attending circumstances, our conclusion is that the amount that should be awarded is $10,000. instead of $40,000, the amount awarded by the decree appealed from. That decree will be here modified, as just indicated, and, as so modified, it is affirmed, with costs against the appellees.

Modified and affirmed.