ATLANTIC TOWING CO. et al. v.
THE CALICHE et al.

MERRY SHIPPING CO. v. SAME.

Nos. 475, 477.

District Court, S. D. of Georgia.

Sept. 8, 1942.

Lawton & Cunningham, of Savannah, Ga., for Atlantic Towing Co.

Connerat & Hunter, of Savannah, Ga., for Merry Shipping Co.

Barry, Wainwright, Thacher & Symmers, of New York City, and Anderson, Cann & Dunn, of Savannah, Ga., for the Caliche.

LOVETT, District Judge.

These are libels in rem against the motor vessel "Caliche", a tanker loaded with gasoline, for salvage services rendered in her rescue after she went aground on the north side of Tybee channel on the north Breaker Shoals. Libellants are the owner of certain tugs that came to her assistance and the owner of a self-propelled river barge into which a portion of the cargo was discharged while the tanker was aground. The cargo and freight were not proceeded against; the claims are against the ship only.

The defenses are the same in both cases—that there was no salvage service in the true or conventional sense, but even if so regarded libellants are entitled only to a moderate award, there being little risk to the salvors and little danger to the property saved.

On the hearing amendments were offered by libellants setting up negligent navigation of the tanker causing the stranding, whereby, it is said, the ship is primarily liable for the proportion of salvage usually chargeable against cargo and freight. On objection to the amendments ruling was reserved.

The cases were heard together, and accordingly may be disposed of in one opinion.

The issues of fact are within narrow compass.

I find as follows:

The "Caliche", bound on a voyage from Texas to Savannah, Ga., went aground with a full cargo of gasoline, approximately 58,000 barrels, at 2 a. m., April 20, 1941, about one hour before high water, near the entrance to the channel off Tybee Island. She was then traveling at a speed, aided by the tide, of 10½ to 11 miles per hour, her full speed. The testimony of the master shows the vessel arrived off Savannah Bar at 12:15 a. m., where and when he anchored to wait for high water. He had been under way about fifteen or twenty minutes when his ship, having left the channel, stranded on the shoals. The second mate was piloting the ship, as he had a pilot's license and the master had none. One of the range lights marking the range leading into the Savannah river had been blown down in a hurricane some months before. Two green buoys had been established on the south side and one on the north side of the channel, and the mate had only these buoys to guide him. In some way he got out of the channel on the north side, in shoal water, between two buoys, where the depth was 19 feet at mean low water. The vessel loaded drew 25 feet 4 inches of water. After grounding the ship worked her engines for an hour or two trying to free herself from the strand without success. The master then wired the owners in New York, told them he was stranded, and asked that they send tugs and assistance, and they in turn communicated with the Towing Company which sent tugs from Savannah to the assistance of the stranded vessel. Later, upon request of the owners, the river barge also went to the place of stranding to lighten the tanker by taking off some of the cargo.

About 9:45 a. m. on April 20th two tugs of the Towing Company, the "Robert W. Groves" and "Wm. F. McCauley", arrived on the scene, made fast to the "Caliche" and took soundings around her. No

effort was made to release her until high water in the afternoon, which was at 3:42 o'clock. The two tugs pulled on the stern from 2 until about 4:30 o'clock, but were unable to move the vessel. The ship was aground her full length about five inches, possibly more. That was the master's estimate. By direction of the master, the tugs then hauled the ship's anchor, weighing about five tons, with sixty fathoms of chain, into deep water. The tide having fallen, the two tugs left for Quarantine Station up the Savannah river, about nine statute miles, intending to return and pull on the ship again on the next tide in the early morning of April 21st, which they did.

The same two tugs pulled and pushed on the starboard side and the ship heaved on her anchor from 2:55 a. m. to 4:45 a. m. the next morning without result, except to slue the stranded ship about in her bed some ten degrees towards the channel. On high water the same afternoon the two tugs were joined by a third, the "Cynthia No. 2", and the three worked on the ship; two of them pushed under the starboard bow and one under the starboard quarter at first, and finally all three were under the starboard bow. These operations continued from 3:15 to 5:40 p. m. Meanwhile, between the pulling on the morning and afternoon tides, the river barge, the "Merry Queen", arrived on the scene from Savannah and loaded approximately 4,500 barrels of gasoline from the "Caliche", taking it up the river to its destination at Savannah. No success attended the efforts of the tugs even though the ship had thus been lightened. They again returned to Quarantine, and perhaps to Savannah.

The barge again went to the "Caliche" on the next morning, April 22nd, and took off 3,500 barrels more of gasoline, finishing the lightering about 1:30 p. m., at which time the wind had changed from a southerly or southeasterly direction into the northeast with a rough sea. The master of the "Caliche" wired the owners that afternoon: "Caliche second lightering finished 1:30 p. m. Think ship will float at high tide 5:00 p. m. No further lightering can be done Strong northeast wind Rough seas". The owners thereupon wired the Towing Company, "Send tugs out to stand by ship. Strong northeast wind Rough sea". Before this message arrived the three tugs had departed. On arrival at the scene the "McCauley"

took hold of the "Caliche" about 2:15 p. m., April 22nd. Again the ship heaved on her anchor and she came off the shoals about 3:10 p. m. The "Cynthia" because her decks were leaking in the heavy weather, recently having undergone repairs, returned to Savannah without performing any service on this day. The "Robert W. Groves" stood by. High tide was at 5:22 p. m.

The "Caliche" then proceeded to Savannah under her own power without incident.

When the vessel stranded and for two days ensuing the weather was good and the sea calm, the breeze being only 6 to 8 miles per hour and from the southeast. On the third day, during the morning of April 22nd, around 11 a. m., it began to breeze up and the wind got fresher and fresher, coming from the northeast, until it reached 6 Beaufort scale, strong breeze, 29.5 miles per hour. This was the condition when the "Merry Queen" stopped taking on cargo at 1:30 p. m., and continued during the afternoon. Where stranded the tanker was fully exposed to the sea. The barge receiving cargo had difficulty remaining alongside. She came up on the lee or starboard side and made fast to the "Caliche" with four lines. Old automobile tires were used as fenders and they were cut by the impact of the vessels. A spar was then put between them and was kept in place with great difficulty. The barge was a flat bottom boat designed for river service only, and her deck was 12 to 14 feet below the deck of the tanker. When the wind shifted to the northeast the barge was on the weather side, and the danger increased. As the seas rose they came over the stern of the barge and there was danger of the lines parting. When the barge finally cut loose at 1:30 p. m., the hose had to be turned loose on the tanker's deck as the barge's deck was under water and it would have washed a man overboard to unhook the hose there. Tanker and barge were steel vessels. If they had collided and ignited a spark, and the hose had parted, the possibility of fire would have been very real.

Each of the three tugs rendering service carried crews consisting of a master and five men; the river barge had a crew of nine men including the master and a pilot who was taken aboard.

The masters of the several tugs had the master of the "Caliche", at the end of each

pulling service, to sign a slip or memorandum showing the time the tug made fast, started and let go, and the draft forward and aft, in which in printed words the following appeared: "The following service has been performed * * * as per conditions and rates for tug services a copy of which has been received by me", and then follows a brief description of the service rendered. The "conditions and rates" in evidence, show the charges for docking, undocking and shifting vessels, and for "pulling on vessels aground in river" at certain described locations, none of which includes the place of stranding, outside, in this case.

By stipulation it is agreed the sound value of the "Caliche" at the time she was grounded was $475,000; value of cargo, less freight, was $116,952.14; freight $11,068; and the cost of repairing damage to the tanker was $14,284. I find the value of the "McCauley" $140,000, the "Groves" $75,000, and the "Cynthia No. 2" $150,000; and the value of the barge "Merry Queen" $140,000.

■ Evidence was taken as to the cost of the tugs many years ago, and of the tax returns. I consider this evidence of little aid in arriving at values. The tugs have been re-conditioned, they are equipped for salvage service and no other like equipment is available in the port of Savannah. Tax returns are unsatisfactory evidence. The court judicially knows that undervaluation for tax purposes in Georgia is common. See The Silverway, Savannah Sugar Refining Corp. v. Atlantic Towing Co., 5 Cir., 15 F.2d 648. The barge was new, its recent cost shown. Other like equipment to the barge may have been available, of less capacity, but it was not shown to have been equally serviceable.

My conclusions of law follow.

The amendments to the libels should be disallowed.

■ Putting aside the urge that they were not seasonably offered, I think the asserted negligent navigation of the "Caliche" would introduce an issue with which we have no concern under the state of the pleadings. The cargo or its owner is not before the court; they were not sued. The action is not founded on any negligence of the "Caliche" vis-a-vis the cargo-owner, but arises only from the successful efforts of the salvors to release the vessel from the strand. The cause of action is not for negligent carriage of cargo. Nor have we a case of general average contribution for sacrifices made or expenses incurred subsequent to stranding in successful efforts to save vessel, freight and cargo, where all of the interests are before the court. Cf. The Irrawaddy, 171 U.S. 187, 18 S.Ct. 831, 43 L.Ed. 130; The Jason, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969. By both Sec. 3 of the Harter Act, 46 U.S.C.A. § 192, and subdivision 2 of Sec. 4 of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304 (2), as between ship and cargo neither the vessel nor her owner is responsible for loss or damage resulting from errors of navigation or default, neglect or acts of the mariner, pilot or servants of the carrier in the navigation or management of the ship, if due diligence to make the ship seaworthy is shown. It is different if the vessel is unseaworthy. The cargo could have been libelled, or under Admiralty Rule 18, 28 U.S.C.A. following section 723, the owner could have been proceeded against in personam. If that had been done and an award for the rescue of the cargo had been paid by the owner, it is clear there would have been no right of action over against the ship for negligent navigation resulting in the stranding which caused the loss. The Marianne, D.C., 24 F.Supp. 786. That being so, I am unable to see why the ship should be indirectly penalized for the benefit of a stranger, the salvors, with whom it had no contractual relation, for saving cargo. After all, saving the cargo was only incidental to saving the ship, and the libellants have only themselves to blame for not bringing the cargo or its owner before the court.

The cases relied on by libellants are distinguishable in their facts. In The Public Bath No. 13, D.C., 61 F. 692, the bailee was a repairman having possession of a vessel for repairs which came adrift through his negligence. Cargo was not involved, and the Harter Act had no application. In The Mercer, 2 Cir., 297 F. 981, cargo was not sued, its value was not proved or stipulated, and was therefore disregarded by the court. A tug and a tow were held liable, and the court said the primary liability for the full amount rested upon the tug because of its negligence; but the tow was not absolved. In The Loyal, D.C., 198 F. 591, lighter and cargo were before the court, one in rem and the other in personam, and unsea-

worthiness—not an error of navigation—was established. Unseaworthiness was also judicially established in The Lackawanna, D.C., 220 F. 1000. In Tice Towing Line v. James McWilliams Blue Line, 2 Cir., 57 F.2d 183, the Director General of Railroads was impleaded in a salvage case between other parties because a tug negligently operated by him set certain barges loaded with coal adrift. He was held liable for an award of salvage against the barges rescued but was relieved from liability for any award against the coal. The opinion by Judge L. Hand relieved the Director General of liability for two reasons, first, the action was barred by a limitation statute, and, secondly, he could be liable only if the barge-owner was liable, and clearly the latter was not because he was an innocent victim himself and had nothing to do with the barges going adrift. The Pine Forest, 1 Cir., 129 F. 700, 1 L.R.A.,N.S., 873, merely holds that one responsible for a disaster may not claim salvage. The remarks of Judge Putnam that general average and salvage run together in a great many respects may be accepted, but I think the same principles of law in this case are not applicable to both. The Silverway, D.C., 14 F.2d 154, is another case where unseaworthiness of the vessel was claimed. The extent of the decision is that the cargo-owner could not fasten the whole liability on the ship in the absence of proper process served on the ship-owner.

I do not mean to say there are no situations where the ship may not be held liable for the whole salvage service, rendered to cargo, freight and ship. If failure to exercise due diligence to make the ship seaworthy at the beginning of the voyage, or liability otherwise of the ship to the cargo for services rendered by others in saving it, is first judicially established with the proper parties before the court, the ship may be required to take all the burden. I hold only that an error of navigation alone with the cargo unrepresented is insufficient. See Carver on Carriage of Goods by Sea, 8th Ed., pp. 513, 514, Sec. 352; The Pyrennee, Br. & L. 189; The Raisby, 5 Asp.M.C. 473; Congdon on General Average, pp. 28, 29.

The tariff of the Towing Company is said to be controlling. I do not regard it as conclusive as to the character of service rendered. It makes no reference to rates for services rendered at a point outside the river and exposed to the sea. It is a mere towing or docking tariff for services within the river and port and has no application to the situation presented in this case. The second page clearly shows the rates given are not applicable to salvage service, for by the tariff the Towing Company attempts in performing service to make itself the servant of the ship and exempt from negligence while towing, docking, etc., but proceeds to say "the foregoing does not apply to any salvage service * * * and that * * * relation of master and servant does not exist * * * in any service by said tugs * * * which at any time saves, assists or protects vessels * * * from peril or impending danger".

The service rendered was a salvage service, though not of the highest class. While the ship now belatedly advances the argument that as the service was rendered in response to a request from the owners, an obligation was implied as in contract to pay pro opere et labore, without regard to the success of the undertaking, no such defense was affirmatively pleaded in the answer and no tender has been made. Such defense is waived unless set up in the answer. The Camanche, 8 Wall. 448, 449(3), 477, 19 L.Ed. 397: "Nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage"; Id., 8 Wall, page 477, 19 L.Ed. 397; Atlantic Transport Co. v. United States, Ct.Cl., 42 F.2d 583, 588. The fact that the shipowner requests assistance and that the salvors in response furnish it, standing alone, does not create an implied contract that defeats a claim for salvage. Baker Salvage Co. v. The Excelsior, D.C., 19 F. 436, 440; The Excelsior, 123 U.S. 40, 50, 8 S.Ct. 33, 31 L.Ed. 75; The R. R. Rhodes, 6 Cir., 82 F. 751(4), 755; The Island City, Fed.Cas. No.55. Even an agreement that the salvor's compensation shall be subsequently fixed by arbitration or the court, at the option of the vessel, does not bar the salvor's right to receive a meritorious award. The Kimberly, D.C., 40 F. 289, 290(3), 302; Boardman v. Bethel, Fed.Cas.No. 1,585. The Quernmore, 5 Cir., 245 F. 855, relied on by the ship, appears to have been a case arising under a contract, and the libellants claimed remuneration for the fair

value of the services rendered only—a quantum meruit. No claim of bounty was asserted.

There remains for determination what should be the amount of reward accorded to the salvors in this case.

■ I will deal with the tugs first. Their service was rendered with promptitude, skill and energy. The master of the saved vessel apparently was satisfied and made no complaint as to the character of the service. The labor expended has been set out in the findings of fact. The service was meritorious and was attended with success. The value of the property saved, i. e., the vessel, has been stipulated, and I have given my findings as to the value of the property employed. The stranded vessel, in my opinion, was in real danger; the tugs were not. This because the one was stranded on dangerous shoals, while the others were afloat and no weather severe enough to endanger the floating equipment was encountered. The service was not greatly perilous to tugs or crews. The evidence in this case discloses that the vessel was well planted on a sand bottom, and that on flood tide the sands are alive and on ebb tide they become compact, particularly when they are banked against a vessel. If a ship remains so stranded and is not promptly moved in her bed or released, the stranding becomes permanent and she breaks up or sinks. Of course, while stranded she is subject to the vicissitudes of changing weather, a real danger in the spring months of the year. The courts have noticed from time to time the characteristics of the sands of the South Atlantic coast. They have been described as retreating under a solid heavy object imbedded in them, whereby stranded ships sink deeper and deeper until they disappear from sight under the sea into the sand, if indeed they are not broken up before. These sandy shoals are sometimes referred to as the "graveyard of the Atlantic". See The Sandringham, D. C., 10 F. 556, 562; The Egypt, D.C., 17 F. 359; The Alamo, 5 Cir., 75 F. 602, 608; The Craster Hall, D.C., 203 F. 188, Id., 5 Cir., 213 F. 436, 438; The Santa Rosa, D. C., 295 F. 350, 351; The Silverway, supra. The wind did not get beyond 30 miles per hour before the ship came off the strand. The stranded ship was fully exposed to the sea, and of course under such circumstances there is always some danger to the tugs, regardless of the weather, where the cargo is liable to ignite. The Towing Company at considerable expense, no doubt, provides salvage equipment, and the only salvage equipment available, in the port of Savannah. It should be encouraged in this respect, and in saving property in distress, on grounds of public policy. Taking all the pertinent circumstances into consideration, I am of the opinion an award of $12,000 should be made to the Towing Company for its services in assisting the vessel without regard to saving of the cargo.

■ The barge "Merry Queen" in some respects stands on stronger and in others on weaker ground. It took off 8,000 barrels of gasoline, worth something more than $2 per barrel. But it is not proceeding against the cargo. It lightened the vessel perhaps 15 inches, and to that extent assisted in getting her off the strand. The same result might have been accomplished, however, had the danger to vessel and cargo been great enough, by pumping the same amount of cargo over the side. The most important consideration, as I view it, is the danger to which the barge voluntarily exposed itself on the second trip to the stranded ship. It was a river barge, with a flat bottom, and its master and crew were unaccustomed to navigating or receiving cargo outside. The wind shifted while it was lashed to the stranded ship on the lee side, and as a result it found itself on the weather side and became exposed to a 30-mile wind in a choppy sea. It stood fifteen feet below the other vessel's deck. Fenders crushed. A spar could not be kept in place. The decks of the barge were awash. The hose could not be disconnected except on the deck of the tanker. If a spark had ignited from the hulls of the two steel vessels rubbing together and the hose had parted, a disastrous fire endangering lives as well as property might have broken out, at once. In short, it seems to me the action of the barge, its master and crew, on the second trip, in an effort to assist the vessel in distress, approached the heroic, when it is remembered their barge was ill designed or equipped for, and the master and crew were without experience in, a service of this kind. For their services I consider an award of $4,000 fair to all, for the services to the ship exclusive of the cargo.

No question of division of awards between the crews and the vessels rendering the service is presented. Libellants' proc-

tors inform the court satisfactory agreements have been made in this regard.

Decrees may be presented, on notice, with more formal findings in each case separately if thought by any of the parties to be necessary under Admiralty Rule 46½.